UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:22-cr-00152-JAW-1 |
| | ) | |
| JOSHUA A. BROUGHAM | ) | |

**ORDER ON MOTIONS TO SUPPRESS**

A criminal defendant brings two motions to suppress, contesting in the first that his warrantless arrest was not supported by probable cause and arguing in the second that his pre-*Miranda* confession taints his post-*Miranda* statements, that police detectives ignored his invocation of the right to remain silent, and that he made involuntary statements while in custody. Viewing the circumstances surrounding the defendant's arrest in the light most favorable to him, the Court nonetheless concludes that the arrest was supported by probable cause and therefore denies the defendant's first motion to suppress. As to the defendant's second motion, the Court agrees that the circumstances surrounding the defendant's pre-*Miranda* confession render his post-*Miranda* statements inadmissible and that the defendant unambiguously invoked his right to remain silent. The Court therefore grants the second motion under both bases.

## I.     PROCEDURAL BACKGROUND

On December 15, 2022, a federal grand jury returned a two-count indictment against Joshua A. Brougham, charging him with 1) armed bank robbery on October 15, 2022 in violation of 18 U.S.C. §§ 2113(a) and (d), and 2) brandishing and using a

firearm during and in relation to a crime of violence on October 15, 2022 in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(A)(ii). *Indictment* (ECF No. 1).

On June 12, 2023, Mr. Brougham filed two motions to suppress. The first sought to suppress evidence arising out of a warrantless arrest that occurred on October 19, 2022, *Mot. to Suppress Re: Warrantless Arrest* (ECF No. 41) (*Def.'s First Mot. to Suppress*), and the second sought to suppress Mr. Brougham's statements to law enforcement after the warrantless arrest. *Mot. to Suppress Statements* (ECF No. 42) (*Def.'s Second Mot. to Suppress*). On July 21, 2023, the Government responded to both of Mr. Brougham's motions to suppress. *Gov't Resp. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 48) (*Gov't Opp'n to Def.'s First Mot. to Suppress*); *Gov't Resp. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 49) (*Gov't Opp'n to Def.'s Second Mot. to Suppress*). On August 14, 2023, Mr. Brougham replied. *Reply Re: Mot. to Suppress Re: Warrantless Arrest* (ECF No. 53) (*Def.'s Reply in Support of Def.'s First Mot. to Suppress*); *Reply Re: Mot. to Suppress Statements* (ECF No. 52) (*Def.'s Reply in Support of Def.'s Second Mot. to Suppress*).

Over the Government's objection, the Court held an evidentiary hearing on October 25, 2023. *Min. Entry* (ECF No. 63). Following the October 25, 2023 evidentiary hearing and the October 30, 2023 filing of a hearing transcript, the Government filed a supplemental brief opposing Mr. Brougham's motions to suppress on December 4, 2023. *Gov't Suppl. Br. in Opp'n to Def.'s Mots. to Suppress* (ECF No. 71) (*Gov't Suppl. Br.*). On December 18, 2023, Mr. Brougham responded. *Resp. to Gov't Suppl. Br. Re: Mots. to Suppress* (ECF No. 72) (*Def.'s Resp. to Gov't Suppl.*

*Br.*). On December 22, 2023, the Government replied. *Gov't's Reply Suppl. Br. in Opp'n to Def.'s Mots. to Suppress* (ECF No. 73) (*Gov't's Reply Suppl. Br.*).

## II.   FACTUAL BACKGROUND

### A.   The Robbery of Camden National Bank

At approximately 11:33 am on October 15, 2022, officers with the Augusta Police Department (APD) were dispatched to Camden National Bank (CNB), located at 21 N. Armory Street in Augusta, in response to a reported armed robbery. *Gov't's Opp'n to Def.'s First Mot. to Suppress,* Attach. 2, *Suppl. Narrative for Detective Michael S. Unterkoefler* at 1 (*Unterkoefler Narrative*). Responding officers reviewed surveillance footage that showed a man walking south on Armory Street before entering the bank through the south entrance of the building. *Id.* at 2. This individual was the only person inside the bank—aside from the bank teller and the bank manager—at the time of the robbery. *Tr. of Proc.* at 14:19-24 (ECF No. 66) (*Suppression Tr.*). Once inside the bank, the man spoke with the teller for approximately one minute before producing a silver handgun from the front pouch of his hooded sweatshirt and pointing it in the direction of the teller. *Unterkoefler Narrative* at 2; *Suppression Tr.* at 15:8-14. The teller then twice placed cash in a newspaper held by the man. *Unterkoefler Narrative* at 2-3.

APD Detective Unterkoefler spoke with the teller following the robbery, and he testified at the suppression hearing that "her description of what had happened was consistent with the video, except she added the dialog[ue] or the conversation that happened." *Suppression Tr.* at 16:2-5. According to the teller, the man asked

3

about opening a checking account, but the teller informed him that CNB could not open any accounts because it was a Saturday. *Id.* at 16:10-15. The man also asked about cashing a check. *Id.* at 16:15-16. When the teller asked to see the check, the man pointed the gun at her, at which point the teller placed two stacks of cash on the newspaper the man was carrying. *Id.* at 16:16-22.

After receiving the money from the teller, the man exited the bank through the south entrance and jogged south through the bank parking lot. *Unterkoefler Narrative* at 3. The man continued traveling south toward Concentra Urgent Care before going out of view near the front of Caldwell Banker Rizzo Mattson Realtors (CBRMR) located at 219 Capitol Street. *Id.* CBRMR and Concentra share a building and parking lot. *Suppression Tr.* at 24:1-11.

Based on surveillance footage and information provided by the bank teller, the investigating officers determined that the person who robbed CNB was a white male with a slim build, short sideburns, and attached ear lobes. *Unterkoefler Narrative* at 4; *Suppression Tr.* at 18:9-14. Detective Unterkoefler testified at the suppression hearing that "the suspect had very unique ears . . . the structure and . . . the characteristics of the suspect's right ear was very unique to me." *Suppression Tr.* at 18:10-14. He also noted that "the suspect's eyelids were like a half oval shape and very pronounced." *Id.* at 18:14-15. The robbery suspect was dressed in a black jacket, a blue hooded sweatshirt, and dark pants with a white stripe down the outer leg. *Unterkoefler Narrative* at 3-4; *Gov't's Opp'n to Def.'s First Mot. to Suppress*, Attach. 1, *Narrative for Patrol Michael N. Raymond* at 3 (*Raymond Narrative*). He was also

4

wearing a fishing hat with a circular brim and a blue surgical mask.  *Unterkoefler Narrative* at 3; *Raymond Narrative* at 3.

### B.    The Robbery Investigation

APD officers and detectives employed a variety of tactics in attempting to locate the person who robbed CNB.  On the day of the robbery, officers conducted two canine sniffs near CNB.  *Raymond Narrative* at 3.  One was unsuccessful.  *Id.*  The other tracked the suspect's scent east, behind Shaw's Supermarket to the Maine Public Employee Retirement System before the suspect's scent dissipated at Florence Street.  *Id.*  Based on the second canine sniff, officers searched the dumpsters behind Shaw's but did not locate any evidence related to the bank robbery.  *Id.*  At the suppression hearing, Detective Unterkoefler—who is not a K9 handler—noted that the area surrounding CNB was unusually busy on the day of the robbery, which may have affected the accuracy of the canine search.  *Suppression Tr.* at 69:12-70:14.

APD officers also interviewed people in the area of the robbery; two identified the hat worn by the robbery suspect as belonging to an unhoused person living in the area.  *Id.* at 55:11-20.  Based on this information, Detective Unterkoefler asked individuals at the Armory, which is located near where the unhoused person was believed to live, to look out for him.  *Id.* at 70:19-71:5.  After reviewing surveillance footage in more detail, however, Detective Unterkoefler determined that the unhoused person was not the robbery suspect.  *Id.* at 71:11-20.

APD Detectives Unterkoefler and Chris Guay also searched the wooded area to the east of Concentra Urgent Care, which is located between Shaw's Supermarket

and Capitol Street, but did not find any evidence of the robbery. *Unterkoefler Narrative* at 6. A search of the area to the south of Concentra Urgent Care, including the dumpsters and roofs of various buildings, likewise failed to uncover any evidence. *Id.* The detectives also searched the areas surrounding the Buker Community Center, the Kings Court Shopping Plaza, and the Big Apple located across from the Kings Court Shopping Plaza but again failed to locate any evidence of the robbery. *Id.* In response to some publicity concerning the robbery, a local citizen provided a tip that the robbery suspect was his son. *Suppression Tr.* at 57:11-19.

On October 17, 2022, Detective Unterkoefler obtained surveillance footage from Maine State Credit Union (MSCU), which is located at 200 Capitol Street, across from CBRMR. *Unterkoefler Narrative* at 7. One of MSCU's surveillance cameras captured the eastern entrance to CBRMR and a small part of the building to the west of the door; however, Detective Unterkoefler determined that there was a blind spot of approximately 100 to 120 feet to the west of this area, not captured by any security cameras. *Id.* Because of this blind spot, Detective Unterkoefler testified that "it was important for us to try to look at all the vehicle traffic so when it went into the blind spot we knew what to expect when it came out of the blind spot." *Suppression Tr.* at 26:8-10.

After viewing the MSCU surveillance footage, Detective Unterkoefler determined that the robbery suspect entered the blind spot, but no surveillance footage showed him leaving the blind spot. *Id.* at 29:16-25, 30:13-31:2. Therefore, Detective Unterkoefler determined that the suspect did not leave the blind spot on

6

foot because "in order for the suspect to have travelled on foot from this area and not be captured by the video surveillance at CNB or MSCU, the suspect would have had to either enter CBRMR or scale the wall and access the roof." *Unterkoefler Narrative* at 7. Detective Unterkoefler mused that both these possibilities were unlikely, in part because CBRMR was closed on the day of the robbery. *Id.* at 7.

While reviewing the surveillance footage, Detective Unterkoefler observed a gold-colored SUV traveling into the line of sight of the MSCU camera a short time after the robbery suspect entered the blind spot. *Id.* Detective Unterkoefler determined that this vehicle had not been traveling on any of the roads that flowed through the area prior to entering the line of sight because he "tracked the vehicle traffic that was coming from all the main routes . . . in all directions." *Id.*; *Suppression Tr.* at 25:23-26:1, 28:1-7. Therefore, he concluded that the SUV came from the south parking lot of CBRMR within the blind spot. *Unterkoefler Narrative* at 7. This SUV also crossed the yellow center line on Capitol Street, indicating that it had turned left from the direction of the CBRMR parking lot. *Id.* at 8. Based on surveillance footage from the area, Detective Unterkoefler surmised that there should have been two vehicles traveling east on Capitol Street but noted that there were in fact three vehicles moving in this direction, including the SUV. *Id.* Based on the footage, Detective Unterkoefler was unable to determine the whereabouts of the SUV prior to the robbery. *Suppression Tr.* at 36:15-22. However, Detective Unterkoefler connected this SUV to the robbery suspect because the suspect entered the blind spot

and there was only one vehicle in the CBRMR parking lot by the time officers responded. *Id.* at 61:21-62:10.

Detective Unterkoefler observed that the SUV had several distinct markings. *Unterkoefler Narrative* at 8. These included a bug guard on the front of the vehicle near the hood, decay or damage on the top of the front passenger wheel well, a running board on the passenger side of the vehicle that appeared to have a defect or mark on the portion closest to the rear passenger tire, and a sticker on the bottom left corner of the driver's side rear window.[1]  *Id.* Detective Unterkoefler shared still images of the vehicle with an individual he knew to be knowledgeable about vehicle makes and models due to his roughly twenty-three years working for a car dealership. *Id.*; *Suppression Tr.* at 29:3-8. This individual was extremely confident that the vehicle was a 2001, 2002, or 2003 GMC Yukon and further advised that the bug guard was an aftermarket product. *Unterkoefler Narrative* at 8; *Suppression Tr.* at 28:17-25. On October 18, 2022, Detective Matthew Estes circulated photographs of the GMC Yukon with all APD patrol officers and advised that there was sufficient basis to stop the vehicle and detain the driver.[2]  *Gov't's Opp'n to Def.'s First Mot. to Suppress*, Attach. 5, *Email from Matthew Estes, Bureau of Crim. Investigation, Augusta Police Dep't, to All Sworn Augusta Police Dep't Officers* (Oct. 18, 2022, 1:08 PM) (*Estes Email*).

---

[1]   Detectives Unterkoefler and Estes testified at the suppression hearing that they were aware that almost all GMC Yukons have running boards. *Suppression Tr.* at 62:11-17, 109:9-12.

[2]   Although Detective Estes did not respond to CNB on the day of the robbery, he became involved in the investigation afterwards, working with Detective Unterkoefler. *Suppression Tr.* at 93:11-21.

After the SUV was identified as a GMC Yukon, Detective Unterkoefler obtained a list of all 2001 to 2003 GMC Yukons registered in Kennebec County, which includes Augusta, where the robbery occurred. *Unterkoefler Narrative* at 8; *Suppression Tr.* at 32:7-13. APD officers researched multiple vehicles from this list but could not initially locate any that matched the vehicle from the surveillance footage. *Suppression Tr.* at 32:19-33:12. Detectives also looked for Chevrolet Suburbans, although they remained confident that the vehicle captured on surveillance footage was a GMC Yukon. *Id.* at 109:6-8.

Eventually, officers identified a gold-colored GMC Yukon registered to Abigail Cameron. *Unterkoefler Narrative* at 8. Law enforcement databases listed Joshua Brougham as Ms. Cameron's boyfriend. *Id.* After viewing "quite a few" photographs of Mr. Brougham, Detective Unterkoefler determined that he matched the description of the bank robbery suspect. *Id.*; *Suppression Tr.* at 34:22-35. Detective Unterkoefler arrived at this conclusion based on Mr. Brougham's body type, the shape of his eyes, and his ears. *Unterkoefler Narrative* at 8. In particular, Detective Unterkoefler noted that Mr. Brougham's right ear appeared very similar to the right ear of the robbery suspect. *Id.* APD officers searched various addresses for Ms. Cameron's GMC Yukon but were unable to locate the vehicle. *Id.* at 9. Detectives did not apply for a warrant for Mr. Brougham's arrest. *Suppression Tr.* at 111:5-6.

## C. The Arrest of Joshua Brougham

At approximately 2:06 pm on October 19, 2022, APD Officer Simon Yorks—who was in uniform and traveling in a marked police cruiser—observed "a beige

colored GMC Yukon" traveling eastbound on Eastern Avenue in Augusta.  *Gov't's Opp'n to Def.'s First Mot. to Suppress*, Attach. 3, *Suppl. Narrative for Patrol Simon A. Yorks* at 1 (*Yorks Narrative*); *Suppression Tr.* at 76:7-13.  Officer Yorks had seen pictures of the GMC Yukon captured on video shortly after the robbery of CNB, and he concluded that he was observing the same vehicle because the GMC Yukon he was observing shared several distinct characteristics with that vehicle, namely a light-colored sticker on the driver's side, running boards, and a bug guard on the hood. *Yorks Narrative* at 1; *Suppression Tr.* at 78:22-25.  Officer Yorks maintained visual contact with the GMC Yukon, *Suppression Tr.* at 79:13-18, and he watched it turn into the parking lot of a gas station on Eastern Avenue and park facing west next to a gas pump.  *Yorks Narrative* at 1.

As he was observing the GMC Yukon, Officer Yorks followed the vehicle and also parked at the gas station.  *Id.*  He saw the male driver exit the vehicle and walk into the store, and he radioed this information to other officers, noting that the male driver resembled the robbery suspect based on pictures circulated to APD officers and reviewed by Officer Yorks.  *Id.*; *Mot to Suppress Hr'g*, Gov't's Ex. 6, *Cruiser Video of Officer Simon Yorks* at 00:01:26-00:01:34 (*Yorks Cruiser Video*); *Suppression Tr.* at 78:7-11.  In response, Detective Estes advised Officer Yorks that the male driver was likely Mr. Brougham and asked that the driver be detained.  *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:01:40-00:02:05.

As the driver was exiting the store, Officer Yorks approached him and asked, "How you doing buddy?"  *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:02:22-

00:02:25. The driver responded, "Are you going to give me a summons for theft?" *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:02:24-00:02:27. Officer Yorks commanded the driver to put his hands on his head, then grabbed the driver's hands and placed them behind his back. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:02:25-00:02:32. The driver asked Officer Yorks why he was being ordered to do this, and Officer Yorks told him not to move and placed him in handcuffs for officer safety reasons. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:02:32-00:02:45. The driver then asked if he could move his vehicle, and Officer Yorks responded not "right now." *Yorks Cruiser Video* at 00:02:44-00:02:48. The driver continued to ask why he was being detained, and Officer Yorks responded that detectives would be with him shortly. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:03:15-00:03:21. Officer Yorks searched the driver's chest, abdomen, back, and legs in an attempt to locate any weapons and removed a knife and two lighters from the driver's person. *Suppression Tr.* at 80:22-81:2; *Yorks Cruiser Video* at 00:02:55-00:03:40. Officer Yorks testified that he detained the driver when he did "due to public safety and the vehicle being involved in the armed robbery at the bank where a firearm was presented, I didn't want the vehicle to be mobile again to potentially, you know, put other public at risk at that time." *Suppression Tr.* at 90:10-16.

When other officers arrived on scene, Officer Webster continued to search the driver while Officer Yorks confirmed that there were no other people in the GMC Yukon. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 00:03:30-00:04:10. During Officer Webster's search, the driver identified himself as Joshua Brougham, and a

11

driver's license bearing the same name was found on his person.  *Gov't's Opp'n to Def.'s First Mot. to Suppress*, Attach. 4, *Suppl. Narrative for Patrol Chad P. Webster* at 1 (*Webster Narrative*); *Yorks Cruiser Video* at 00:04:15-00:04:37; *Mot. to Suppress Hr'g*, Gov't's Ex. 7, *Cruiser Video of Officer Chad Webster* at 00:01:31-00:01:34 (*Webster Cruiser Video*).

After Mr. Brougham was searched, he was seated in the back of Officer Yorks' police cruiser to wait for APD detectives to arrive.  *Yorks Cruiser Video* at 00:04:55-00:05:17.  After a few minutes, Detective Estes arrived on scene.  *Yorks Cruiser Video* at 00:07:55; *Webster Cruiser Video* at 00:05:43.  Detective Estes examined the GMC Yukon and noted that it had the same identifying features as the Yukon in the surveillance footage.  *Webster Cruiser Video* at 00:05:56-00:06:27; *Suppression Tr.* at 99:4-7.  As a result, Detective Estes determined that the Yukon would be seized as evidence and towed.  *Suppression Tr.* at 100:4-5.  Detective Estes also asked that Mr. Brougham be searched again, *Webster Cruiser Video* at 00:08:27-00:08:38, and he observed that Mr. Brougham had the same characteristics as the robbery suspect.  *Suppression Tr.* at 100:4-9.  After Mr. Brougham was searched again, the detectives asked Officer Yorks to transport Mr. Brougham to the police department and wait with him in an interview room, which Officer Yorks did.  *Yorks Narrative* at 2; *Yorks Cruiser Video* at 00:11:11-00:11:58; 00:14:28-00:14:38.

## D. The Interview of Joshua Brougham at the Augusta Police Department

After escorting Mr. Brougham to the interview room, Officer Yorks waited with him until detectives arrived.  *Mot. to Suppress Hr'g*, Gov't's Ex. 8, *Interview Video of*

*Joshua Brougham* at 00:01:15-00:36:57 (*Interview Video*). Officer Yorks testified that Mr. Brougham's demeanor "seemed apparently normal" during this time. *Suppression Tr.* at 85:4-7. The two men mostly passed the time in silence, with Mr. Brougham occasionally requesting that Officer Yorks adjust his handcuffs or let him use the bathroom or smoke a cigarette. *Id.*; *Gov't's Opp'n to Def.'s Second Mot. to Suppress*, Attach. 2, *Tr. of Joshua Brougham's Police Interview* at 3:4-8:9 (*Interview Tr.*). At one point, Mr. Brougham remarked to Officer Yorks, "If you want me to talk to anybody, I want to take a piss and I want to smoke a cigarette. . . . Otherwise . . . I ain't going to talk to nobody." *Interview Video* at 00:34:50-00:34:58; *Interview Tr.* at 7:21-8:1. More than thirty minutes after Mr. Brougham and Officer Yorks entered the room, Detective Estes entered, *Interview Video* at 00:36:57, at which point the following exchange occurred:

> **Mr. Brougham:** Can I take a piss and smoke a cigarette?
> **Detective Estes:** Yeah, we can do that.
> **Mr. Brougham:** And I'll talk to whoever you want.
> **Detective Estes:** All right. Sounds good.

*Interview Video* at 00:36:59-00:37:06; *Interview Tr.* at 8:12-17. Detective Estes then allowed Officer Yorks to handcuff Mr. Brougham's hands in front of him instead of behind his back. *Interview Video* at 00:36:57-00:37:45; *Interview Tr.* at 9:3-15. Shortly thereafter, Mr. Brougham, Officer Yorks, and Detective Estes left the room so that Mr. Brougham could smoke a cigarette. *Interview Video* at 00:37:58-00:38:07; *Suppression Tr.* at 101:15-19.

After roughly ten minutes, Detective Estes and Mr. Brougham returned to the interview room. *Interview Video* at 00:47:50. Detective Estes then left once again, at

which point Detective Wastella entered and sat with Mr. Brougham for roughly eighteen minutes. *Id.* at 00:48:04-01:06:00. During this time, Mr. Brougham and Detective Wastella engaged in an extensive conversation centered on Mr. Brougham's history of substance abuse. *Id.*; *Interview Tr.* at 10:13-22:23, 24:2-31:21.

Mr. Brougham initially brought up the topic of substance abuse during the following exchange:

> **Detective Wastella:** I'll put those [cigarettes] inside just in case you want another one.
> **Mr. Brougham:** Yeah, I figured I would -- I like the taste, anyway. Honestly, I fell 40 feet and they took my -- they prescribed me 120 Percocets --
> **Detective Wastella:** Mm-hmm.
> **Mr. Brougham:** -- right from rib. Never done pain pills before. I was an alcoholic at the time.
> **Detective Wastella:** Mm-hmm.
> **Mr. Brougahm:** That's where my addiction started.
> **Detective Wastella:** Yeah.
> **Mr. Brougham:** Yep.

*Interview Video* at 00:48:23-00:48:49; *Interview Tr.* at 10:14-11:3. During the ensuing conversation, Detective Wastella asked several follow-up questions, including when Mr. Brougham's addiction started, *Interview Video* at 00:48:49-00:48:51; *Interview Tr.* at 11:5-6, whether Mr. Brougham transitioned from Percocet and Oxycontin to other drugs, *Interview Video* at 00:49:42-00:49:47; *Interview Tr.* at 12:10-11, whether Mr. Brougham was still using drugs, *Interview Video* at 00:52:10-00:52:16; *Interview Tr.* at 15:17-19, what quantity of drugs Mr. Brougham was taking per day at the height of his addiction, *Interview Video* at 00:52:18-00:52:29; *Interview Tr.* at 16:1-4, and whether Mr. Brougham snorted or injected drugs. *Interview Video* at 00:52:29-00:52:33; *Interview Tr.* at 16:10-11. During the conversation, Mr. Brougham also

14

remarked that he had been discharged from probation three months earlier, which prompted Detective Wastella to ask what had caused Mr. Brougham to be placed on probation. *Interview Video* at 00:50:19-00:50:28; *Interview Tr.* at 13:5-9.

At one point, Detectives Unterkoefler and Estes briefly entered and exited the room. *Interview Video* at 00:57:23-00:58:15. After the other detectives left, Detective Wastella steered the conversation back toward the topic of drugs:

> **Detective Wastella:** We'll give you another cigarette. That's no big deal. If I could, I would. If I could give you one right here, I'd give you one right here.
> **Mr. Brougham:** Yep.
> **Detective Wastella:** Because then I don't have to walk down the stairs. You know what I mean?
> **Mr. Brougham:** Does make it easier.
> **Detective Wastella:** I mean, a gram and a half a day, though, is -- I mean, it's not great; but it's not . . . terrible, either.
> **Mr. Brougham:** No.
> **Detective Wastella:** I've seen worse, you know?

*Interview Video* at 00:58:36-00:59:03; *Interview Tr.* at 24:21-25:10. Detective Wastella subsequently asked additional questions about the circumstances that led to Mr. Brougham being placed on probation, *Interview Video* at 01:00:29-01:00:35, 01:00:42-01:00:45; *Interview Tr.* at 26:17-18, 27:3-4, and then asked further questions about Mr. Brougham's drug use. *Interview Video* at 01:01:37-01:01:44; *Interview Tr.* at 28:5-8. Eventually, Detectives Unterkoefler and Estes re-entered the room, at which point the conversation came to an end and Detective Wastella left. *Interview Video* at 01:06:00-01:06:38.

Upon entering the interview room, Detectives Unterkoefler and Estes gave Mr.

Brougham food and water. *Interview Video* at 01:06:03-01:06:11. After the detectives

formally introduced themselves, the following exchange occurred:

> **Detective Unterkoefler:** So, yeah, we -- we're basically looking to talk
> to you. So we put some information out to our patrol guys, and let them
> know that we were looking to speak with you.
> **Mr. Brougham:** Can you give me a lighter and leave me alone for five
> minutes? And I'll answer any . . . question you want.
> **Detective Estes:** What do you mean, alone?
> **Mr. Brougham:** You give me a lighter and leave me alone for a minute,
> I'll answer anything you want. I don't even care if you sit here. You give
> me a lighter.
> **Detective Unterkoefler:** You can't have a lighter in here.
> **Mr. Brougham:** Then I got no questions to answer.

*Interview Video* at 01:06:50-01:07:18; *Interview Tr.* at 33:3-18. The detectives then

asked Mr. Brougham why he wanted the lighter, and Mr. Brougham responded that

he just wanted to hold it. *Interview Video* at 01:07:18-01:07:34; *Interview Tr.* at 33:19-

34:7. Mr. Brougham then reiterated, "You give me a lighter and one minute, and I'll

answer any question you want. Other than that, just bring me to the cell." *Interview*

*Video* at 01:07:34-01:07:40; *Interview Tr.* at 34:8-11. Detective Estes then briefly left

the room to retrieve a lighter. *Interview Video* at 01:07:40-01:08:15. After Detective

Estes returned and handed the lighter to Mr. Brougham, Mr. Brougham renewed his

request to be left alone, at which point both detectives left the room. *Id.* at 01:08:15-

01:09:06.

Once the detectives were out of the room, Mr. Brougham untied both his shoes,

at which point the detectives decided to re-enter the room. *Id.* at 01:09:06-01:09:28;

*Suppression Tr.* at 41:21-23. Prior to the detectives re-entering, Mr. Brougham

removed a bag of crack cocaine and a pipe from his shoes. *Interview Video* at 01:09:28-

01:09:43. While Mr. Brougham was trying to open the bag of crack cocaine, Detectives Unterkoefler and Estes re-entered and took the crack cocaine and pipe away from him, with Detective Estes saying, "Listen, we don't care about that.  We don't care about that."  *Id.* at 01:09:43-01:09:50; *Interview Tr.* at 36:19-20; *Suppression Tr.* at 41:24-42:1.  Mr. Brougham protested, saying, "Let me have my . . . pipe back and I'll -- leave me alone and I'll answer any questions."  *Interview Video* at 01:09:50-01:09:55; *Interview Tr.* at 36:22-24.  Mr. Brougham was not able to ingest any crack cocaine while in the interview room.  *Suppression Tr.* at 42:8-10, 102:8-10.

After the detectives had taken the pipe, drugs, and lighter from Mr. Brougham, the following exchange occurred:

> **Detective Unterkoefler:** Listen, we don't care about the drugs.  Okay?  I get it.  You have an addiction.  We might be able to help you with something like that.
> **Detective Estes:** Come on.  Come on, man.  This isn't going to help any.  Okay?
> **Mr. Brougham:** I just want to get my pipe, and I'll answer any --
> **Detective Estes:** No.  We're not -- we're not.  We can't.  Listen, man.  I know -- I want you to be able to -- let's go in --
> **Mr. Brougham:** No, I don't want to talk to you then.  Bring me to jail.

*Interview Video* at 01:09:55-01:10:15; *Interview Tr.* at 37:7-19.  Mr. Brougham was then placed in handcuffs again.  *Interview Video* at 01:10:15-01:11:39.

Once Mr. Brougham was handcuffed, Detectives Unterkoefler and Estes reiterated that they didn't care about Mr. Brougham's drug possession in an attempt to get Mr. Brougham to calm down.  *Interview Video* at 01:12:10-01:12:57; *Interview Tr.* at 39:13-40:11; *Suppression Tr.* at 42:16-25.  Mr. Brougham then interjected, "I wish it did kill me. . . . Wouldn't be doing this right now.  I'm ready to go to the cell. I don't want to talk to anybody."  *Interview Video* at 01:12:57-01:13:10; *Interview Tr.*

at 40:12-15.  He continued, "I don't want to  . . . talk about nothing now.  All yours dude.  I don't even care what it's about.  You can tell me what it is; but . . . ." *Interview Video* at 01:13:10-01:13:18; *Interview Tr.* at 40:17-20.

Detective Unterkoefler interpreted Mr. Brougham's statements about not wanting to talk and wanting to be taken to his cell as "he was kind of lashing out at us," *Suppression Tr.* at 43:17-19, and Detective Estes had a similar interpretation. *Id.* at 103:1-6.   Detective Unterkoefler testified that he did not believe Mr. Brougham's statements created a legal obligation to terminate the interview because "I never felt at any point that we ever got to the part of informing Mr. Brougham that of his *Miranda* rights, and making it clear to him that he did not have to speak with us " and "those statements were more indicative of him kind of just being upset with us." *Id.* at 63:18-64:12.  He later clarified that "I did not believe at the time that Mr. Brougham was clearly informing us that he did not want to speak with us" in part because "he continually engaged us." *Id.* at 64:19-22.  Detective Estes similarly testified that "[n]ot once did I believe that [Mr. Brougham] invoked his rights when he was talking to us." *Id.* at 112:8-12.  Instead, Detective Estes "purely took [Mr. Brougham's statements] as he was frustrated with the situation, and he was frustrated that he was probably getting to the point of withdrawing from the drug addiction and needed to smoke to take care of that." *Id.* at 114:16-19.

After Mr. Brougham made statements about not wanting to talk and wanting to be taken to his cell, the following exchange ensued, during which both detectives

repeatedly emphasized the importance of understanding Mr. Brougham's version of

events:

> **Detective Estes:** Well, that's kind of why we wanted to talk initially about some things.
> **Mr. Brougham:** Sure.
> **Detective Estes:** You know, what's going on.  What we're looking into.
> **Mr. Brougham:** Yeah, I'm sure you do.
> **Detective Estes:** Um, we have a ton of -- we've had an investigation over the last four or five days --
> **Mr. Brougham:** Mm-hmm.
> **Detective Estes:** -- and we're trying to, you know, give you the opportunity to explain yourself.  Um, the addiction, obviously, explains a lot of -- of where you're at and what you're dealing with.  So we'd like to, you know, get that backstory.  Um, we really want to give you the opportunity for that, to be able to talk to us and explain yourself.  Okay?
> **Mr. Brougham:** Yeah.
> **Detective Unterkoefler:** I know you mentioned it before; but the people I've talked with and, you know, some of that stuff that we've already seen -- actually, I didn't come here thinking you were . . . a evil person, you know?
> **Detective Estes:** And your addiction does explain a lot to me, um, because I've seen it, and  I know people do stupid shit because of that, because of the addiction is so --
> **Mr. Brougham:** So what I am -- what am I here for then?
> **Detective Unterkoefler:** So what are you -- I'm going to sit down for a second, okay?  I'll give you a minute, give yourself a minute, and we're all just going to cool down.  All right?  Let me, uh -- you talk to Matt, and I'll be in a few minutes.  Okay?  I'm going to explain some stuff to you.  All right?  Does that sound fair?
> **Mr. Brougham:** Yeah.
> . . .
> **Detective Estes:** Yeah. Obviously we can take you to jail whenever we wanted to, right?
> **Mr. Brougham:** Mm-hmm.
> **Detective Estes:** But we want to talk to you.
> **Mr. Brougham:** What for?
> **Detective Estes:** Because we want to get the backstory here.  Because we don't think, again, that you're some evil guy out there trying to -- trying to harm people.
> **Mr. Brougham:** No.
> **Detective Estes:** Okay?  And nobody was harmed; but we -- we need to get the -- the backstory on this.  Okay?  Because we don't want just the

-- the black and white story.  We want everything around it.  Okay? What your story is.  Why this -- why we got -- why you are in this position right now.  And we have to talk to you to be able to do that.  Otherwise it's black and white.  It's just what we've figured out so far, and we can't get why and what you were dealing with.  And why you were where you were that -- that day, and why you are where you are now.  Otherwise, if we can't talk to you, we can't get any of that information.  Does that make sense?

**Mr. Brougham:** Mm-hmm.

**Detective Estes:** Otherwise we're just -- otherwise we would've just hauled you over to the jail right off.

**Mr. Brougham:** Mm-hmm.  For [something].[3]

**Detective Estes:** Huh?

**Mr. Brougham:** For [something].

**Detective Estes:** Yep.  For the -- the case we're looking into right now.

**Mr. Brougham:** Mm-hmm.

**Detective Estes:** And I'll bet -- I'll tell you, there was something that happened on Saturday, and we're trying to figure out some stuff.  Okay?

**Mr. Brougham:** Hmm.

**Detective Estes:** So in order for us to get your story, we bring you back here and we try to talk to you.  Okay?  And I get that you're struggling right now with addiction.  And that's -- that's number one priority when you're dealing with that.  Pretty much nothing else matters much.  I've been dealing with this long enough to know that from talking to people.  And I have had very few success stories in addiction.  It's unfortunate.  There are some out there.  And knowing the backstory of these people sometimes can help.  Okay?

**Mr. Brougham:** Okay.

*Interview Video* at 01:13:18-01:17:00; *Interview Tr.* at 40:21-44:22.   After this exchange, Detective Estes left the room, leaving Detective Wastella, who had re-entered, alone with Mr. Brougham.  *Interview Video* at 01:17:00-01:17:10.

---

[3]     The transcript of Mr. Brougham's interview reads, "Mm-hmm.  For possession." *Interview Tr.* at 43:25.  In its opposition to Mr. Brougham's second motion to suppress, the Government challenges this transcription, asserting that "upon information and belief, the defendant states 'for something' twice when Detective Estes tells him that they want to speak with him." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 4 n.4.  The Court reviewed the video of Mr. Brougham's interview and agrees with the Government that Mr. Brougham says, "for something," not "for possession."  As a result, the Court has updated the transcript accordingly.

While in the room, Detective Wastella asked Mr. Brougham whether he had "dope" with him, and Mr. Brougham responded that it was crack. *Interview Video* at 01:17:40-01:17:49; *Interview Tr.* at 45:4-8. During this time, Mr. Brougham also stated, "I'm ready to go whenever. I want to take a nap," and "I don't want to talk," to which Detective Wastella responded, "Just sit -- just sit and chill until they, uh." *Interview Video* at 01:19:33-01:19:44; *Interview Tr.* at 47:1-2, 47:7-9. Soon thereafter, Mr. Brougham said, "I ain't going to enjoy life from here on out, so I don't even . . . care. Bring me to jail. Whatever." *Interview Video* at 01:19:50-01:19:56; *Interview Tr.* at 47:13-15. After about three and a half minutes, Detectives Unterkoefler and Estes re-entered the room and Detective Wastella left. *Interview Video* at 01:20:32-01:20:59.

Once Detectives Unterkoefler and Estes were alone with Mr. Brougham, they opened the conversation as follows:

> **Detective Unterkoefler:** So -- so this is what's going on. Okay? And you don't have to talk. I'm not going to try to force you to talk. Obviously, we want to talk to you, otherwise we would've just taken you to jail. And the reason we want to talk to you is because last Saturday, there was a robbery that happened. Okay? And that's what we want to talk to you about.
> **Mr. Brougham:** Mm-hmm.
> **Detective Unterkoefler:** And that's why we're trying to give you the opportunity to talk. So, you know, obviously some shit went down. I get it. You know, you're stressed. I totally would expect that. Um--
> **Mr. Brougham:** So what happens when I talk to you?
> **Detective Unterkoefler:** So the reason we want to talk is, obviously, you're here for a reason, right?
> **Mr. Brougham:** Mm-hmm.
> **Detective Unterkoefler:** We've been investigating this for four days. You know, we've got a wealth of information that led us to why you're sitting here in this chair. Okay?
> **Mr. Brougham:** Mm-hmm.

> **Detective Unterkoefler:** The reason we want to talk is to find out some information that we don't know.  Okay?  And -- and also verify some of the information that we do know.  And also give you an opportunity to be honest --
> **Mr. Brougham:** Well, that's not going to do me any good anyway.
> **Detective Estes:** Well, like I said, the backstory is important, and it does make a difference.
> **Mr. Brougham:** Yeah.
> **Detective Estes:** It makes a difference when people go in front of a judge.  There's a guy that doesn't admit anything wrong, and then there's the guy who tells a story of why they did this, and they're not an animal.

*Interview Video* at 01:20:47-01:22:00; *Interview Tr.* at 48:21-50:13.  After this, Mr. Brougham raised the subject of his drug addiction, and the detectives again stressed the importance of speaking with them.  *Interview Video* at 01:22:00-01:22:48; *Interview Tr.* at 50:14-51:22.  Then, Mr. Brougham stated, "I robbed a bank because I needed drugs.  Is that what you want to hear?" *Interview Video* at 01:22:48-01:22:54; *Interview Tr.* at 51:23-24.

In response to Mr. Brougham's confession, Detective Estes said, "We're not telling you what to say," "We want to talk to you about -- learn about that," and "We know that."  *Interview Video* at 01:22:54-01:23:03; *Interview Tr.* at 52:1-6.  Mr. Brougham then turned back to the subject of his drug addiction, which led to the following exchange:

> **Mr. Brougham:** I need to get rid of the demons I got. . . . I wish you well.  It ain't going to go away from here.  I know it.
> **Detective Unterkoefler:** Well, I wish I could.
> **Mr. Brougham:** I -- I wish you could too.
> **Detective Estes:** We want to talk about that.  Okay?
> **Mr. Brougham:** A bullet in my head.  That's about the only thing that I could do.
> **Detective Estes:** Well, I know that -- I know -- I know people that have gotten away from it.
> **Mr. Brougham:** But I tried to do it last night, and --

**Detective Estes:** You -- you tried to do what? Listen --

**Mr. Brougham:** I -- I would've shot myself if I did it right.

**Detective Unterkoefler:** Well, I'm glad you didn't.

**Detective Estes:** I'm glad you didn't.

**Mr. Brougham:** I can't get away from it, man. I've tried. I guess you guys will help me.

**Detective Estes:** We -- we will. I've been part of success stories. I have a success stor[y] right now that I still text with seven years later.

**Mr. Brougham:** Hmm.

**Detective Estes:** I still communicate with him.

**Mr. Brougham:** Yeah.

**Detective Estes:** And I still talk to him. And they're still clean.

**Detective Unterkoefler:** They visit.

**Detective Estes:** They actually come and visit me, you know.

**Mr. Brougham:** Yeah.

**Detective Estes:** It -- it does happen; but --

**Mr. Brougham:** I did good when I was on Suboxone; but they took that away and . . . I couldn't make it.

**Detective Estes:** No shit. Listen, we want to talk further about this. Okay? And we want to help you; but in order to do that, we have to explain some things to you, okay?

*Interview Video* at 01:23:03-01:24:12; *Interview Tr.* at 52:12-54:8. The detectives then

turned to administering the *Miranda* warnings. *Interview Video* at 01:24:12-

01:28:31; *Interview Tr.* at 54:9-59:21.

Before Detective Unterkoefler actually read Mr. Brougham his *Miranda*

rights, however, the following exchange occurred:

**Detective Unterkoefler:** Yeah. So basically, obviously, you know, we have procedures that we have to go through, right? You know, you['re] being detained, you're under arrest, you['re] not leaving, right? So part of that procedure is you do have the right not to talk to us.

**Mr. Brougham:** Yep.

**Detective Unterkoefler:** I'm not going to try to pry any kind of information out of you. I'm not bullshitting you when I say -- when I -- when I want to talk to you and understand the why -- the why things happen. I do believe, wholeheartedly, that it's an important piece of that puzzle. Okay? So just procedures -- part of those procedures is what's called your Miranda rights. Okay?

**Mr. Brougham:** Mm-hmm.

**Detective Unterkoefler:** And it's basically your rights that I'm going to read to you, that's just going to basically explain to you that you do not have to talk to me. Okay? And, like I said, I'm not going to sit here and try to pry it out of you; but I honestly -- you know, I've been doing this a long time, and I've seen people in your position, and I -- I truly believe in my heart that the people that have the best results in the end that are in your situation are the people that they're just honest and open about why things happened. Okay?[4]

**Mr. Brougham:** Yeah, there ain't no good results of this. I'm going to ruin my kids' life, everything.

**Detective Unterkoefler:** Well --

**Mr. Brougham:** But yeah. Either way, I already know what I did. What do you want to hear?

*Interview Video* at 01:24:18-01:25:27; *Interview Tr.* at 54:15-56:1.

In response, Detective Unterkoefler read Mr. Brougham the *Miranda* warnings from a sheet of paper. *Interview Video at* 01:25:40-01:28:30; *Interview Tr.* at 56:7-59:21. Mr. Brougham verbally indicated that he understood each of the *Miranda* rights, and he answered in the affirmative when asked if he wished to speak with the detectives. *Interview Video* at 01:27:20-01:28:19; *Interview Tr.* at 57:24-59:11. Immediately after Mr. Brougham consented to speak with the detectives, Detective Unterkoefler advised him, "And, again, if I ask you a question, right, and you don't feel comfortable answering, just don't answer the question, tell me, [n]ext question." *Interview Video* at 01:28:19-01:28:25; *Interview Tr.* at 59:12-15. Detective Unterkoefler then immediately turned back to the topic of the robbery, saying:

Um, but so -- so basically, it's quite the, uh -- the opening here from our introduction; but yeah, we'll just get right to the point. I think you just said that you know why you're here. So basically we're investigating a robbery that happened on Saturday. Okay? Um, and, you know, putting

---

[4] The Interview Transcript attributes these statements to Mr. Brougham, not Detective Unterkoefler. *Interview Tr.* at 55:7-19. After reviewing the Interview Video, however, the Court has determined that Detective Unterkoefler was the person who made these statements. *Interview Video* at 01:24:49-01:25:18. As a result, the Court has modified the transcript accordingly.

> two and two together with what just happened, I'm assuming, you know,
> based on our conversation -- I'm not assuming, I know, based on our
> conversation, that you've been an addict for a long time, and that's
> probably a good assumption for me to assume that's why you did what
> you did on Saturday.

*Interview Tr.* at 59:21-60:10.   Mr. Brougham responded, "Yep," before Detective

Unterkoefler began asking specific questions.   *Id.* at 60:11. At the suppression

hearing, Detective Unterkoefler agreed that the interview with Mr. Brougham was

"a continuous flow" and that the detectives did not stop the interview and then

resume it after an extended period of time at any point.   *Suppression Tr.* at 68:15-20.

Detectives Unterkoefler and Estes proceeded to ask Mr. Brougham questions

about the robbery of CNB.   *Interview Video* at 01:28:30-02:03:38; *Interview Tr.* at

59:21-113:20.   In response, Mr. Brougham made several incriminating statements.

*See, e.g.*, *Interview Video* at 01:29:52-01:29:56; *Interview Tr.* at 61:18-19.   He also

corroborated details about the robbery that had not been released to the public.

*Suppression Tr.* at 47:21-22.   At one point while he was being questioned, roughly

eight and a half minutes after Detective Unterkoefler administered the *Miranda*

warnings, *Interview Video* at 01:28:19-01:36:48, Mr. Brougham signed a written

waiver of his *Miranda* rights.   *Interview Video* at 01:36:34-01:36:48; *Gov't Opp'n to*

*Def.'s Second Mot. to Suppress*, Attach. 3, Miranda *Warning*.   Mr. Brougham was

given the written waiver to sign while Detective Unterkoefler was in the midst of

asking him a question: "Would you be interested in -- forgot to have you sign this,

sorry.   Would you be interested in us reaching out to some contacts and have them

maybe talk to you and meet with them?" *Interview Tr.* at 70:18-23.   At no point after

the *Miranda* warnings were given did Mr. Brougham ask to end the interview or stop questioning. *Suppression Tr.* at 105:8-9.

At the suppression hearing, Detective Unterkoefler described the interview with Mr. Brougham—after Mr. Brougham "realized, you know, the cocaine base was out of the picture"—as "nice and calm." *Id.* at 49:6-15. He also described Mr. Brougham as "polite" and "engaging." *Id.* at 49:14-15. Detective Estes similarly described the interview as "pretty calm and forthcoming," and he noted that Mr. Brougham was "calm and straightforward," as well as "articulate." *Id.* at 105:2-7.

Drawing on his experience in law enforcement, Detective Unterkoefler testified that he "never had the indication that [Mr. Brougham] was really high, but he very well could have had substances in him to kind of keep him balanced and level." *Id.* at 50:19-22. Still, Detective Unterkoefler testified that he had no concerns about Mr. Brougham not understanding his questions. *Id.* at 50:23-25. He further testified that "at no point did I ever think that he wasn't aware of the conversation we were having in knowingly talking with us." *Id.* at 74:9-11.

Detective Estes, who has interacted with "dozens upon dozens" of individuals under the influence of drugs during his time in law enforcement, did not notice Mr. Brougham exhibiting any signs of impairment. *Id.* at 105:16-19, 108:7-11. He reached this conclusion because Mr. Brougham was "[a]rticulating, understanding questions, wasn't falling asleep or wasn't agitated, wasn't having trouble sitting still." *Id.* at 108:12-17. Further, Detective Estes testified that "the desire to smoke cocaine base in our interview room tells me that he was not currently under the influence"

26

because "he wanted that high again." *Id.* at 108:17-19.  At the suppression hearing, Detective Estes also described the common mannerisms of people under the influence of illegal drugs and testified that for a typical user, the effects of fentanyl, heroin, and crack cocaine begin to subside within an hour of using.  *Id.* at 105:20-108:6.

After the conclusion of Mr. Brougham's interview, he placed a phone call to his girlfriend, Abigail Cameron, during which he advised her that he would not be coming home because he had robbed a bank the previous Saturday with a gun that he'd taken from his uncle, Casey Brougham.  *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 11 n.5.[5]  Later during the call, Mr. Brougham told his uncle Casey that he had taken a gun from him and robbed a bank.  *Id.*

## III.   THE POSITIONS OF THE PARTIES

### A.   Joshua A. Brougham's Motions to Suppress

In his first motion to suppress, Mr. Brougham seeks to suppress "all evidence gained as a result of the illegal warrantless arrest of Defendant, such having occurred without probable cause and therefore in violation of Defendant's rights under the Fourth Amendment of the United States Constitution."  *Def.'s First Mot. to Suppress* at 1.  Mr. Brougham suggests that the identification of a "*possible* suspect vehicle"— which was alternatively described as "a gold colored Yukon," "a light colored full size SUV," and a "beige colored GMC Yukon"—was insufficient to establish the probable cause necessary to support a warrantless arrest.  *Id.* at 1 (emphasis in original).

---

[5]      While both the Government and Mr. Brougham acknowledge this phone call taking place, the call itself is not a matter of record.  Therefore, the Court has cited a filing from the Government as factual support.

Therefore, he concludes, "[a]ll evidence gained as a result of the illegal arrest should be barred as fruit of the poisonous tree." *Id.* at 2.

In his second motion to suppress, Mr. Brougham seeks to suppress "all statements made by Defendant after his arrest" on the grounds that such statements were made after Mr. Brougham "had been interrogated for a lengthy period of time without *Miranda* warnings" and "had twice requested to be taken to his cell, which requests were ignored." *Def.'s Second Mot. to Suppress* at 1. Further, Mr. Brougham contends, "[e]ven after *Miranda* warnings, there is insufficient evidence of a knowing and voluntary waiver of those rights." *Id.* In support of these arguments, Mr. Brougham contends that he was interrogated for some time without *Miranda* warnings, which were only given after he made the statement, "I robbed a bank because I needed drugs." *Id.* He also asserts that "where the original statement was made without required *Miranda* warnings, subsequent statements should also be excluded when the interrogation was continued with the same officers, in the same location, and where there was no significant delay in the continued questioning." *Id.* at 2. Mr. Brougham concludes by suggesting that "it is unclear at best as to whether Defendant ever voluntarily waived *Miranda* warnings." *Id.*

## B.   The Government's Responses

In its response to Mr. Brougham's first motion to suppress, the Government argues that "[b]ecause the defendant's initial detention was lawful, and because law enforcement had probable cause to arrest him, the motion should be denied." *Gov't's Opp'n to Def.'s First Mot. to Suppress* at 1. The Government characterizes Officer

Yorks' initial detention of Mr. Brougham as an investigative stop and argues that the "detention was justified because it was based on reasonable suspicion that the defendant had committed an armed robbery at CNB just a few days earlier and the officer observed the defendant driving the GMC Yukon involved in the robbery." *Id.* at 9-10.  Further, the Government points out that "the defendant was only detained for a brief period of time while officers determined his identity and detectives responded, looked at the exterior of the vehicle, and confirmed that it was the one involved in the robbery." *Id.* at 11.  Afterwards, according to the Government, "[l]aw enforcement then placed the defendant under arrest and transported him to APD." *Id.*

Were the Court to conclude that "the defendant was under arrest at the moment he encountered Officer Yorks when he left the store," the Government continues, "law enforcement had probable cause to arrest him for the robbery at that time." *Id.* at 11-12.  In support, the Government reviews the steps law enforcement took to identify Mr. Brougham as the robbery suspect. *Id.* at 13-14.  The Government also observes that "[w]hile the defendant appears to attribute substantial weight to minor differences in the description of the color of the GMC Yukon, the officers' descriptions are all consistent with each other and they are not different in any material way." *Id.* at 14 n.5.  In conclusion, the Government reiterates that "law enforcement had probable cause to arrest the defendant on October 19, 2022, based on a 'fair probability' that the defendant had robbed CNB." *Id.* at 14.

In its response to Mr. Brougham's second motion to suppress, the Government argues that Mr. Brougham's post-*Miranda* confession "should not be suppressed because it was made after the defendant was advised of his *Miranda* rights and knowingly and voluntarily waived those rights." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 6. The Government initially represents that it will not use Mr. Brougham's statements to Detective Wastella in its case-in-chief. *Id.* at 2 n.3, 8. Even so, the Government argues that Detective Wastella did not ask Mr. Brougham "any questions about the robbery or use any improper tactics or coercion to extract a confession from the defendant," meaning that "this is not the type of situation where law enforcement engaged in an improper 'two-step interrogation' where they first secure a confession from a suspect and then provide the suspect with *Miranda* warnings after the fact." *Id.* at 8.

The Government next represents that "[b]efore the defendant provided a full confession to the robbery, law enforcement advised the defendant of his *Miranda* rights," and Mr. Brougham "knowingly and voluntarily waived his *Miranda* rights." *Id.* at 9. Acknowledging Mr. Brougham's contention that it is "'unclear at best as to whether Defendant ever voluntarily waived' *Miranda*," *Id.* at 9 (quoting *Def.'s Second Mot. to Suppress* at 2), the Government counters that "the defendant provides no support for this assertion, nor does he explain why it is 'unclear' whether the defendant waived his *Miranda* rights." *Id.* at 9. To the contrary, the Government continues, "the record contains overwhelming evidence that the defendant knowingly and voluntarily waived his *Miranda* rights." *Id.* at 10. In particular, the Government

points out that Detective Unterkoefler "read the *Miranda* warnings out loud to [Mr. Brougham], and the defendant said he understood each right (including that he could stop questioning at any time) and he wanted to speak with the detectives, and he executed a written waiver of his rights." *Id.* at 11.

As an aside, the Government notes that Mr. Brougham "does not appear to seek suppression of the statements he made" during a recorded phone call with Abigail Cameron and Casey Brougham after his confession to the detectives, where he "advises Cameron that he won't be coming home because he robbed a bank on Saturday with a gun that he took from . . . Casey" and "tells Casey that he took a gun from him and robbed a bank." *Id.* at 11 n.5. The Government represents that "those statements are not the product of custodial police interrogation" and contends that "[e]ven assuming the Court were to find a *Miranda* violation here, the Government submits that the remedy should not involve suppressing voluntary statements . . . made to other individuals." *Id.* Notwithstanding, "the Government submits that the defendant knowingly and voluntarily waived his *Miranda* rights," meaning that his post-*Miranda* statements "should not be suppressed." *Id.* at 11.

Turning to Mr. Brougham's contention that he had twice requested to be taken to his cell, the Government counters that Mr. Brougham "fails to provide any substantive argument as to why this should lead to the suppression of his confession." *Id.* at 12. Further, according to the Government "[t]he defendant's statements that he wanted to go to his cell did not clearly communicate to law enforcement that he wanted to invoke his right to remain silent and cease questioning." *Id.* In addition,

31

the Government claims that "the defendant was advised of his *Miranda* warnings and the record shows that he understood those rights and made a deliberate choice to waive them and speak with law enforcement," meaning that Mr. Brougham necessarily "waived his right to remain silent." *Id.* at 13.

The Government does acknowledge that Mr. Brougham made "statements before he was interviewed that he no longer wished to speak with [law enforcement] because they took his pipe away from him." *Id.* Nonetheless, according to the Government, "[u]nder the specific circumstances here, it would not be reasonable for the detectives to be on notice that the defendant was clearly invoking his right to remain silent." *Id.* Per the Government's characterization, Mr. Brougham "made these statements in the heat of the moment after his pipe was taken, before any questioning had occurred, and immediately after this, the defendant asked detectives why he was there." *Id.* at 13-14. Further, the Government claims that Mr. Brougham made these statements "well in advance of questioning and before he was read *Miranda* warnings, he had previously indicated several times that he was interested in speaking with [law enforcement], and at no time during questioning or in response to being read his *Miranda* rights did he say he wanted to stop talking." *Id.* at 14.

The Government further submits that "the record demonstrates that the defendant wanted to speak with the detectives, that he understood he could stop answering questions at any time, and that his decision to waive his right to remain silent was a deliberate and intentional one, made with full knowledge of the consequences of doing so." *Id.* The Government continues, "After the defendant made

32

these statements about not wanting to talk, the detectives 'scrupulously honored' his wishes and they did not question him; instead, they took a break and left the room." *Id.* at 15.  Therefore, the Government concludes that Mr. Brougham did not invoke his right to remain silent and instead "knowingly and voluntarily waived his right to remain silent and agreed to speak with the detectives."  *Id.*

###    C.    Joshua A. Brougham's Replies

In further support of his first motion to suppress, Mr. Brougham disputes that Officer Yorks' initial detention was an investigatory stop, countering that "Defendant does not concede that there ever was any detention but in fact an immediate arrest." *Def.'s Reply in Support of Def.'s First Mot. to Suppress* at 1.  Mr. Brougham also takes issue with the Government linking the GMC Yukon to the robbery, noting that "[o]ther vehicles left the same area around the same time as the SUV" and "[t]wo other vehicles were seen approaching the area where the suspect was walking and stopping, which were potential getaway vehicles."  *Id.* at 2. Mr. Brougham further points out that there was "no license plate identification of the vehicle" and "there was inconclusive evidence at best that the suspect did not flee on foot, and in fact the investigating officer cites two such possibilities."  *Id.*  Therefore, Mr. Brougham concludes that the belief "[t]hat the Yukon Brougham was driving when he was arrested was involved in the robbery was nothing but speculation."  *Id.*

Further, Mr. Brougham contends that "[i]f the police had probable cause that [he] had committed an armed robbery they could have sought an arrest warrant" but did not do so.  *Id.* at 2-3.  Mr. Brougham then closes by reiterating that "[s]ignificant

issues exist as to whether [he] was arrested without probable cause and whether all evidence gained as a result of that arrest should be suppressed." *Id.* at 3.

In further support of his second motion to suppress, Mr. Brougham contends that the Government's opposition "blatantly disregards that Brougham confessed prior to *Miranda*." *Def.'s Reply in Support of Def.'s Second Mot. to Suppress* at 1. According to Mr. Brougham, his pre-*Miranda* confession "occurred after repeatedly invoking his right to remain silent and to be taken to his cell." *Id.* at 2. Mr. Brougham then recounts all the statements he believes constitute invocations of his right to remain silent. *Id.* at 2-3.

Turning to whether he voluntarily waived his *Miranda* rights, Mr. Brougham asserts that his "state of mind and his addiction and lack of control were fully in evidence by his smoking crack cocaine right in the interview room." *Id.* at 3. He further contends that the detectives' "discussion about how the police had helped others with their addictions" was "perilously close to an improper promise rendering the statements involuntary." *Id.* According to Mr. Brougham, "[p]roviding [him] with a lighter while in custody to induce him to talk, without *Miranda*, resulting in an attempt to ingest crack cocaine in the interview room, leading to discussions about addiction and helping him and not charging him with felony possession" "in order to induce statements, may certainly be seen as improper promises and inducements." *Id.* Therefore, Mr. Brougham concludes, "The Government's attempts to minimize and even ignore the critical interactions between law enforcement and Brougham,

34

and even to assert that the entire issue should be summarily dismissed, is certainly remarkable and not worthy of credence by the Court." *Id.* at 4.

### D.   The Government's Post-Hearing Supplemental Brief

In its post-hearing supplemental brief, the Government initially addresses Mr. Brougham's first motion to suppress. *Gov't's Suppl. Br.* at 3-4. While the Government "respectfully rests on its prior submission to show that the defendant was lawfully detained and arrested on October 19, 2022," it nonetheless "offers a few brief remarks on this issue." *Id.* at 3. After briefly reviewing the evidence that led detectives to the GMC Yukon and Mr. Brougham, the Government argues that "Officer Yorks detained the defendant after observing that the GMC Yukon driven by the defendant matched the vehicle involved in the robbery" and determining that "the defendant appeared similar to the robbery suspect." *Id.* at 3-4. Subsequent to this initial detention, according to the Government, "detectives arrived, looked at the exterior of the vehicle, and confirmed that it was the one involved in the robbery," and Detective Estes determined that Mr. Brougham "matched" the robbery suspect. *Id.* at 4. After these observations were made, the Government contends, Mr. Brougham "was arrested and transported to APD." *Id.* at 4. Based on its characterization of events, the Government "submits that the testimony and exhibits presented at the hearing show that law enforcement had reasonable suspicion to detain the defendant on October 19, as well as probable cause to arrest him." *Id.* at 3.

The Government next addresses whether Mr. Brougham's post-*Miranda* confession should be suppressed. *Id.* at 4-8. According to the Government, *Missouri*

*v. Seibert*, 542 U.S. 600 (2004), governs this analysis. *Id.* Under *Seibert*, the Government contends, the admissibility of a post-*Miranda* confession "when interrogators question first and warn later" is governed by "the following factors: 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 5 (quoting *Seibert*, 542 U.S. at 611-12, 615-16).

According to the Government, Mr. Brougham's conversation with Detective Wastella constitutes the first interrogation for the *Seibert* analysis. *Id.* at 5-6. Before conducting the *Seibert* analysis, however, the Government stresses that "this initial conversation with the detective pre-*Miranda* was initiated by the defendant, it concerned the defendant's substance use history, it was a cordial interaction, and it occasionally involved questions by the detective about the defendant's drug use." *Id.* Further, the Government notes that Detective Wastella "did not use any improper tactics or coercion to extract a confession from the defendant." *Id.* at 6. While the Government again acknowledges that it will not use Mr. Brougham's statements to Detective Wastella in its case-in-chief, it maintains that "the record establishes that the two detectives who interviewed the defendant about the robbery advised him of his *Miranda* rights and that the defendant knowingly and voluntarily waived those rights." *Id.*

Turning to the *Seibert* analysis itself, the Government argues that "the record demonstrates that the first detective did not conduct a complete or detailed interview with the defendant." *Id.* According to the Government, Detective Wastella "did not ask the defendant any questions about the robbery." *Id.* Instead, the Government continues, "the detective's questions were limited and related to the defendant's prior drug use," and "the defendant voluntarily and openly discussed his history of substance use, often volunteering information." *Id.*

On the second *Seibert* factor, the Government "agrees that there is a slight overlap between the interviews because both included a discussion of the defendant's substance use." *Id.* at 7. The Government counters, however, that "the defendant's pre-*Miranda* statements almost exclusively concern his substance use," while "his post-*Miranda* statements almost exclusively relate to the robbery." *Id.* Further, according to the Government, "there is no indication that the detectives confronted the defendant with his prior statements to the first detective to extract a confession post-*Miranda* from the defendant, unlike in the *Seibert* case where the officer expressly confronted the suspect with her pre-*Miranda* statements." *Id.*

Pivoting to the third *Seibert* factor, the Government concedes that both interviews "occurred in the same interview room at APD on the same day," although it points out that there "was a short break between the two interviews after the defendant attempted to remove a crack pipe from his shoe when law enforcement left the room." *Id.* The Government also contends that "[n]either interaction with the defendant . . . was unreasonably long" and "the defendant was interviewed about the

robbery by two detectives who were not involved in the initial interaction with the defendant." *Id.*

Finishing with the fourth *Seibert* factor, the Government asserts that the two interviews constituted "two distinct and different interactions with the defendant." *Id.* The Government maintains that "there was no continuation of questioning from the first interview to the second one," meaning that "when detectives interviewed the defendant about the robbery after *Miranda*, he was presented with a genuine and actual choice about whether to give a statement about the robbery." *Id.* Concluding its discussion of *Seibert*, the Government submits that "[b]ecause the record demonstrates that the defendant made an informed choice to speak with the detectives, and *Miranda* therefore functioned effectively," Mr. Brougham's second motion to suppress should be denied. *Id.* at 8.

The Government then concludes its post-hearing memorandum with a discussion of whether Mr. Brougham's confession was voluntary. *Id.* at 8-10. The Government declares that "there is no evidence that the defendant's will was overborne by law enforcement or that his statements were the product of police coercion." *Id.* at 9. The Government points out that Mr. Brougham was not able to use any narcotics in the interview room and adds that "there is no indication that the defendant, to the extent he was going through drug withdrawal or had a substance in his system, was unable to comprehend what was going on that day." *Id.* The Government further asserts that there is no "evidence or even suggestion that the detectives coerced the defendant into making incriminating statements." *Id.* To the

38

contrary, the Government submits that the "tone of the interview was conversational, the detectives gave the defendant food and water, the defendant appears calm and shows little emotion, and his statements to the detectives were confident and matter of fact."  *Id.* at 10.  As a result, the Government argues, "the totality of the circumstances show that the defendant made a deliberate and informed choice to speak with the detectives and that his confession was voluntary," meaning that the Court should deem it admissible.  *Id.*

### E.    Joshua A. Brougham's Response to the Government's Post-Hearing Supplemental Brief

In his response, Mr. Brougham first observes that the "evidence presented in Court failed to establish sufficient probable cause to support the warrantless arrest of Defendant."  *Def.'s Resp. to Gov't's Suppl. Br.* at 1-2.  Indeed, according to Mr. Brougham, "[t]he overwhelming weight of evidence at the scene supported that the robber came to the bank on foot and fled on foot."  *Id.* at 1.

In support, Mr. Brougham suggests that "[t]he fact that the suspect came from the North and fled to the South, on foot, leads to an obvious inference that the suspect came and went on foot."  *Id.*  He also contends that the two canine searches lend greater support to the theory that the robbery suspect fled on foot, noting that "[t]here was also no evidence of video surveillance or other investigation along the route that the K9 marked as the suspect's route of travel."  *Id.* at 1-2.  Further, Mr. Brougham points out that the police received other tips about potential robbery suspects.  *Id.* at 2.  Therefore, Mr. Brougham concludes, "[w]hile it has to be acknowledged that police investigation went from the alleged involved vehicle to the owner of the *possible*

vehicle to the owner's significant other, the Defendant, it is not clear from the evidence exactly when those connections were made and whether a reputed skinny build and attached ear lobe could establish probable cause when so much evidence went in other directions, particularly since no arrest warrant was ever sought or secured." *Id.* at 2 (emphasis in original).

Turning to whether his post-*Miranda* statements should be suppressed based on his pre-*Miranda* interactions with detectives, Mr. Brougham argues that the Government "remarkably asserts that statements made by the Defendant to the first officer involved in the interrogation do not taint subsequent statements." *Id.* at 3. He continues, "While the Court rightly raised the issue of the existence of similar subject matter, i.e., drugs and addiction, involving the first interviewer and the subsequent interviews, the most substantial aspects of Defendant's challenge involve[] multiple invocations made to" Detectives Unterkoefler and Estes "prior to the issuance of *Miranda* warnings." *Id.* at 3. In Mr. Brougham's view, the Government "wholly sidesteps the truth" by ignoring that "Defendant made numerous Fifth Amendment invocations to the same two detectives, Estes and Unterkoefler, who had substantial interactions with Defendant prior to their administering *Miranda* warnings" and that "Defendant made a direct inculpatory statement to the two detectives prior to *Miranda*." *Id.* at 3-4. Therefore, he reiterates that his statements "pre and post *Miranda* were tainted by illegality and should be suppressed." *Id.* at 4.

40

Finally, addressing the voluntariness of his post-*Miranda* confession, Mr. Brougham suggests that "drug addiction and intoxication can play a role in whether statements are seen as legally Voluntary." *Id.* at 4. He further contends that "the detectives from the beginning played upon [his] drug addiction and made suggestions and *impermissible* promises to help him, including a statement that he would not be charged for felony possession and/or trafficking in prison contraband, etc. based upon their sole interest in the robbery." *Id.* (emphasis in original). After acknowledging that the video of his interrogation "provides the best evidence" as to whether his will was overborne, Mr. Brougham emphasizes that his "condition of severe addiction and his erratic behavior underscores the unconstitutional actions of the police in continuing the interrogation of Defendant despite repeated invocations of the right to remain silent." *Id.* at 5. Therefore, Mr. Brougham concludes that "all his statements," including those made to his family after the interrogation, should be suppressed. *Id.*

### F. The Government's Reply

In reply, the Government contends that Mr. Brougham's probable cause argument "focuses exclusively on only a few select pieces of evidence and ignores completely the substantial evidence establishing that law enforcement had reasonable suspicion to detain the Defendant . . . as well as probable cause to arrest him for the robbery." *Gov't Reply Suppl. Br.* at 1. In the Government's view, "while the Defendant places great emphasis on a few leads . . . the record demonstrates that the detectives diligently followed up on those leads." *Id.* at 2-3. Further, the

Government points out that "video surveillance showed the robbery suspect's direction of travel, which was inconsistent with the canine track, and showed that the suspect fled to the area of the realty parking lot." *Id.* at 3. According to the Government, the other leads referenced by Mr. Brougham were not "borne out or substantiated by the evidence." *Id.* As a result, the Government concludes, "there was a fair probability that the Defendant had committed the robbery . . . and law enforcement had probable cause to arrest him." *Id.* at 2.

Next, the Government asserts that Mr. Brougham's requests to be taken to jail "would not have put a 'reasonable officer under the circumstances' on notice that the Defendant was unequivocally invoking the right to remain silent and that he wanted to cease questioning." *Id.* at 3 (quoting *Smith v. Boughton*, 43 F.4th 702, 709 (7th Cir. 2022)). Even assuming that these statements "amounted to a clear and unambiguous invocation of the right to remain silent," the Government continues, "the detectives scrupulously honored [Mr. Brougham's] wishes and did not proceed forward with questioning him about the robbery immediately after the pipe incident—instead, they took a break and left the interview room." *Id.* at 4. Further, the Government points out that the detectives read Mr. Brougham his *Miranda* rights when they returned, and it once again submits that "the Defendant knowingly and voluntarily agreed to speak with the detectives after being advised of his *Miranda* rights and waiving them in writing." *Id.* at 5. Therefore, the Government concludes that Mr. Brougham's statements should not be suppressed on the ground that he invoked his right to remain silent. *Id.* at 3-5.

Turning to whether law enforcement conducted an improper two-step interrogation, the Government acknowledges that Mr. Brougham "appears to assert that his pre-*Miranda* statements about wanting to go to a jail cell and his statement immediately prior to being read *Miranda* that he robbed a bank should lead to the suppression of his post-*Miranda* confession because they were made to the same detectives." *Id.* at 5 n.2. The Government counters, however, that these statements "were not in response to police interrogation and therefore do not warrant the same analysis under *Seibert*." *Id.* In the Government's view, "the pertinent issue is whether the Defendant's pre-*Miranda* statements to the drug detective, sometimes in response to questioning, warrants suppression of his post-*Miranda* confession." *Id.* Answering this in the negative, the Government "submits that the Defendant's post-*Miranda* confession should not be suppressed because . . . he was not improperly interviewed about the robbery before being advised of his *Miranda* rights, and . . . he made an informed choice to speak with the detectives after being read and ultimately deciding to waive his *Miranda* rights." *Id.* at 5-6.

Finally, the Government reiterates that Mr. Brougham's confession was voluntary and is therefore admissible. *Id.* at 6-7. According to the Government, "[t]he uncontested evidence . . . establishes that the Defendant was not able to smoke the narcotics in the interview room." *Id.* at 6. Further, the Government argues that "the recording from the interview shows that the detectives did not improperly promise the Defendant anything, nor did they tell him that he wouldn't be charged for the drugs." *Id.* In particular, the Government maintains that "the detectives did not

make any improper promises of leniency" and only "said that they might be able to help [Mr. Brougham] with his addiction and that they would pass information on to the right people." *Id.* at 7. Therefore, the Government concludes, "[t]here is no evidence showing that [Mr. Brougham's] statements were the result of police coercion." *Id.*

## IV.  DISCUSSION

### A.  The Existence of Probable Cause

At the outset, the parties disagree over how to characterize Mr. Brougham's detention on October 19, 2022 prior to his transportation to the Augusta Police Department. The Government argues that Officer Yorks' initial detention was an investigative stop that only ripened into an arrest after "officers determined [Mr. Brougham's] identity and detectives responded, looked at the exterior of the vehicle, and confirmed that it was the one involved in the robbery." *Gov't's Opp'n to Def.'s First Mot. to Suppress* at 1. Mr. Brougham, on the other hand, "does not concede that there ever was any detention but in fact an immediate arrest." *Def.'s Reply in Support of Def.'s First Mot. to Suppress* at 1. The Court declines to address this dispute, finding it immaterial because the Court otherwise finds that Officer Yorks had probable cause to arrest Mr. Brougham from the moment he detained him.

The United States Supreme Court held in *Carroll v. United States*, 267 U.S. 132 (1925), and affirmed in *United States v. Watson*, 423 U.S. 411 (1976), that a law enforcement officer with probable cause may make a warrantless arrest for a felony in a public place, even though the officer may have had an adequate opportunity to

44

obtain an arrest warrant.  *Carroll*, 267 U.S. at 156; *Watson*, 423 U.S. at 417; *see also United States v. Parker*, 549 F.3d 5, 8 (1st Cir. 2008) ("Outside the home, the police can arrest without a warrant anyone who they have probable cause to believe committed a felony").  "[I]f an arrest is not based on probable cause, then statements and evidence obtained as a result of the arrest are inadmissible." *United States v. Fiasconaro*, 315 F.3d 28, 34 (1st Cir. 2002).  "Probable cause is a prerequisite not only for a formal arrest but also for a de facto arrest." *United States v. Rasberry*, 882 F.3d 241, 246-47 (1st Cir. 2018).

Quoting the United States Supreme Court, the First Circuit has defined "probable cause" as a "fluid concept," one that is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 249-50 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  In general, however, "[p]olice have probable cause to arrest when, 'acting upon apparently trustworthy information,' they 'reasonably can conclude that a crime has been . . . committed and that the suspect is implicated in its commission." *United States v. Mulkern*, 49 F.4th 623, 629 (1st Cir. 2022) (second alteration in original) (quoting *Karamanoglu v. Town of Yarmouth*, 15 F.4th 82, 87 (1st Cir. 2021)).

Probable cause "does not require law enforcement officers to have 'an ironclad case . . . on the proverbial silver platter.'" *United States v. Centeno-González*, 989 F.3d 36, 45 (1st Cir. 2021) (alteration in original) (quoting *United States v. Diallo*, 29 F.3d 23, 26 (1st Cir. 1994)); *see also Kaley v. United States*, 571 U.S. 320, 338 (2004) (noting that probable cause "is not a high bar").  "Instead, '[i]t suffices if . . . a prudent law enforcement officer would reasonably conclude that the likelihood existed that

criminal activities were afoot, and that a particular suspect was probably engaged in them.'" *Centeno-González*, 989 F.3d at 45 (alterations in original) (quoting *Diallo*, 29 F.3d at 26). "Nevertheless, facts which otherwise may be sufficient to establish probable cause can be overborne by contrary material facts known to law enforcement." *Mulkern*, 49 F.4th at 629.

Under First Circuit precedent, an "objective standard is employed to determine whether an officer has probable cause to effect an arrest." *Rasberry*, 882 F.3d at 250. An "inquiring court" must "examine the events leading up to the arrest and then determine 'whether these historical facts, viewed from the standpoint of a reasonable officer, amount to probable cause.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Further, probable cause "requires only the kind of fair probability on which reasonable and prudent [people], not legal technicians, act." *Id.* at 249-50 (alteration in original) (quoting *Kaley*, 571 U.S. at 338).

"When determining the universe of facts that [a court] may properly consider as the basis for probable cause, [a court] may look to 'the collective knowledge of several officers.'" *Mulkern*, 49 F.4th at 630 (quoting *United States v. Cruz-Rivera*, 14 F.4th 32, 44 (1st Cir. 2021)). This means that a court can take into account "the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." *United States v. Azor*, 881 F.3d 1, 8 (1st Cir. 2017); *see also Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by

all"). In other words, "that the arresting officer may have lacked probable cause for the arrest of the suspect does not mean that the arrest is invalid for lack of probable cause. It is enough that the collective knowledge and information of all the officers involved establishes probable cause for the arrest." *United States v. Pardue*, 385 F.3d 101, 106-07 (1st Cir. 2004) (emphasis omitted) (quoting *United States v. Paradis*, 802 F.2d 553, 557 (1st Cir. 1986)).

Based on these principles, the Court briefly recounts what was known to law enforcement at the time Officer Yorks detained Mr. Brougham. First, based on surveillance footage and information provided by the bank teller, law enforcement had determined that the robbery suspect was a white male with a slim build, short sideburns, attached earlobes, and eyelids that were "a half oval shape and very pronounced." *Unterkoefler Narrative* at 4; *Suppression Tr.* at 17:9-15. Second, the robbery suspect had entered CNB through the south entrance, *Unterkoefler Narrative* at 2, and he left through the same entrance, jogging south before entering a blind spot not captured by any security cameras. *Id.* at 3; *Suppression Tr.* at 29:16-25, 30:13-31:2. Third, although the suspect entered the blind spot on foot, he did not leave on foot, since he would have been captured by security cameras had he done so. *Unterkoefler Narrative* at 7. Fourth, shortly after the suspect entered the blind spot, a gold-colored SUV entered the line of sight of a security camera, and officers concluded the SUV came from the blind spot. *Id.* at 7-8; *Suppression Tr.* at 25:23-26:1, 28:1-7. Fifth, this SUV was later determined to be a 2001-2003 GMC Yukon, and it had several distinct features, including a bug guard near the hood, decay or

damage to the top of the front passenger wheel well, a running board on the passenger side of the vehicle that appeared to have a defect or mark on the portion closest to the rear passenger tire, and a sticker on the bottom left corner of the driver's side rear window. *Unterkoefler Narrative* at 8. Sixth, after the SUV was identified as a GMC Yukon, Detective Unterkoefler obtained a list of all 2001-2003 GMC Yukons registered in Kennebec County and researched multiple vehicles on that list. *Unterkoefler Narrative* at 8; *Suppression Tr.* at 32:7-13, 32:19-33:12, 109:6-8. Seventh, from the list of Yukons, detectives identified a vehicle registered to Abigail Cameron, and law enforcement databases listed Mr. Brougham as Ms. Cameron's boyfriend. *Unterkoefler Narrative* at 8. Eighth, after viewing "quite a few" photographs of Mr. Brougham, Detective Unterkoefler concluded that he matched the description of the robbery suspect based on his body type, the shape of his eyes, and his ears. *Unterkoefler Narrative* at 8; *Suppression Tr.* at 34:22-35. Ninth, while on patrol on October 19, 2022, Officer Yorks observed a GMC Yukon that shared several distinct features with the Yukon captured on surveillance footage—including a bug guard on the hood, running boards, and a light-colored sticker on the driver's side— and he determined that the driver of this Yukon, Mr. Brougham, resembled the robbery suspect. *Yorks Narrative* at 1; *Suppression Tr.* at 78:7-11, 78:22-25; *Yorks Cruiser Video* at 00:01:26-00:01:34.

Employing an objective standard—and taking into account the collective knowledge of all the APD officers participating in the investigation—the Court concludes that these facts, when viewed together, provided Officer Yorks with

probable cause to arrest Mr. Brougham.  Together, the distinct facts listed above form a chain linking Mr. Brougham to the robbery.  In particular, the Court places great emphasis on the resemblance of Mr. Brougham to the robbery suspect, the resemblance of the GMC Yukon Mr. Brougham was driving to the Yukon that detectives believed was involved in the robbery, and to the combination of these two independent facts, namely that Mr. Brougham, the suspect, was operating the suspect vehicle.  Mindful of the fact that probable cause "is not a high bar," *Kaley*, 571 U.S. at 338, the Court determines that Officer Yorks had probable cause to arrest Mr. Brougham at the time he detained him.

Mr. Brougham disagrees, pointing to several pieces of evidence which, in his mind, necessitate the conclusion that law enforcement "failed to establish sufficient probable cause to support the warrantless arrest of Defendant." *Def.'s Resp. to Gov't's Suppl. Br.* at 1.  First, he highlights inconsistencies in how various officers described the color of the GMC Yukon, pointing out that it was alternatively described as "gold colored," "light colored," and "beige colored." *Def.'s First Mot. to Suppress* at 1. Second, he points out that "[o]ther vehicles left the same area around the same time as the SUV," that "[t]wo other vehicles were seen approaching the area where the suspect was walking and stopping, which were potential getaway vehicles," and that "[t]here was no license plate identification of the vehicle." *Def.'s Reply in Support of Def.'s First Mot. to Suppress* at 2.  Third, he argues that officers claimed "that the Real Estate business was likely closed on a Saturday morning without any support for the proposition." *Id.*  Fourth, he suggests that "[t]he fact that the suspect came

from the North and fled to the South, on foot, leads to an obvious inference that the suspect came and went on foot," as does the result of the two canine searches.  *Def.'s Resp. to Gov't's Suppl. Br.* at 1.  Fifth, he highlights that officers interviewed two citizens who believed that the hat worn by the robbery suspect was consistent with one belonging to an unhoused person.  *Id.* at 2.  Finally, he notes that a different citizen identified his son as the robbery suspect.[6]  *Id.*  Although the Court is mindful that "facts which otherwise may be sufficient to establish probable cause can be overborne by contrary material facts known to law enforcement," *Mulkern*, 49 F.4th at 629, it concludes that is not the case here.

To start, the Court declines to give any weight to minor differences in how officers described the color of the Yukon, as the descriptions are all generally consistent with one another and officers relied on identifying features besides the Yukon's color.  Moreover, when Detective Estes sent out information about the Yukon, he attached photographs of the suspect vehicle so any ambiguity from the various descriptions of color would have been cleared by the photographs of the vehicle itself.  *Estes Email* at 2-3.  Likewise, the Court does not credit Mr. Brougham's claim that law enforcement provided no support for the assertion that CBRMR was closed.  Detective Unterkoefler's report, which was admitted into evidence during the suppression hearing, plainly states that the business was closed.  *Unterkoefler*

---

[6]    Mr. Brougham also advances the view that "there was inconclusive evidence at best that the suspect did not flee on foot, and in fact the investigating officer cites two such possibilities."  *Def.'s Reply in Support of Def.'s First Mot. to Suppress* at 2.  However, Mr. Brougham provides no record citation for this assertion.  Based on its review of the record, the Court assumes that Mr. Brougham is referring to the two canine sniffs—which the Court already addresses—and therefore has not separately listed this contention.

*Narrative* at 7.  Mr. Brougham has pointed to no part of the record that undermines this conclusion, and the Court is aware of none.

Further, several facts proffered by Mr. Brougham are undermined by other facts in the record.  At the suppression hearing, Detective Unterkoefler testified that the two vehicles identified by Mr. Brougham could not have been getaway vehicles because the suspect "very clearly runs parallel down Concentra Urgent Care," whereas the first vehicle "went through the drive-through on the north side of the teller station," and the second "parked in the south parking lot and that customer actually went inside the store." *Suppression Tr.* at 60:2-15.  Likewise, the dog sniffs have little probative value because surveillance video captured the suspect fleeing into the blind spot, *id.* at 29:16-25, 30:13-31:2, and he did not leave the blind spot on foot.  *Id.*; *Unterkoefler Narrative* at 7.

Ultimately, Mr. Brougham's contentions amount to the argument that officers did not have probable cause to arrest him because there were other live leads at the time of his arrest.  But "police officers do not have an unflagging duty to complete a full investigation before making a probable cause determination." *Mulkern*, 49 F.4th at 629 (internal quotations omitted).  Nor are officers required "to have 'an ironclad case . . . on the proverbial silver platter.'"  *Centeno-González*, 989 F.3d at 45 (alteration in original) (quoting *Diallo*, 29 F.3d at 26).  The record shows that the detectives pursued the other leads noted by Mr. Brougham. *Suppression Tr.* at 57:11-58:4, 71:13-20.  Yet after identifying the GMC Yukon on surveillance footage, the detectives became "extremely confident" that they "were on the right track of where

the suspect had left." *Id.* at 71:18-20.  The Court will not second guess the detectives' assessments of the strengths of their various leads, especially because Mr. Brougham has not provided any evidence that the detectives miscalculated in any way.  Nor is the Court able to find that the mere existence of other leads undermined the probable cause supporting Mr. Brougham's arrest.   The Court therefore rejects Mr. Brougham's arguments.

Mr. Brougham makes one additional assertion in support of his first motion to suppress, urging the Court to draw an adverse inference from the fact that detectives did not seek an arrest warrant.  *Def.'s Resp. to Gov't's Suppl. Br.* at 2.  But the Court has already said that officers may make a felony arrest supported by probable cause in a public place, regardless of whether they could have obtained a warrant.  *Carroll*, 267 U.S. at 156; *Watson*, 423 U.S. at 417.  Because there is no requirement that officers obtain a warrant even if they have the opportunity to do so, the Court declines to draw the inference Mr. Brougham suggests.  Instead, the Court concludes that there was probable cause to arrest Mr. Brougham.  Accordingly, the Court denies Mr. Brougham's first motion to suppress.

### B.   The Effect of Mr. Brougham's Pre-*Miranda* Interaction with Law Enforcement on his Post-*Miranda* Confession

The Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), "and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights — including the right to remain silent and the right to consult an attorney — before interrogating a suspect in a custodial setting." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020).  These warnings, commonly

referred to as the *Miranda* warnings, function to "preserve the suspect's Fifth Amendment privilege against compelled self-incrimination, be it by confession or admission," during custodial interrogations. *United States v. Rogers*, 659 F.3d 74, 77 (1st Cir. 2011). Statements made by a suspect subjected to custodial interrogation without *Miranda* warnings generally cannot be admitted into evidence. *United States v. Simpkins*, 978 F.3d 1, 9 (1st Cir. 2020); *Carpentino*, 948 F.3d at 20.

"Despite their importance, *Miranda* rights may be waived," meaning that a "suspect, having been duly advised of his *Miranda* rights, may forgo those rights and voluntarily submit to questioning." *Simpkins*, 978 F.3d at 9. To validly waive their *Miranda* rights, a suspect must do so "knowingly, intelligently, and voluntarily." *United States v. Rang*, 919 F.3d 113, 117 (1st Cir. 2019). Conversely, "a suspect may bring the questioning to a halt" by invoking the right to remain silent or the right to counsel. *Simpkins*, 978 F.3d at 9-10. Such an invocation must be unambiguous. *See Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (discussing the right to remain silent); *Davis v. United States*, 512 U.S. 452, 458-59 (1994) (discussing the right to counsel).

The *Miranda* doctrine becomes more complicated in situations, like this one, where a suspect is first interrogated without *Miranda* warnings and subsequently interrogated again after *Miranda* warnings have been provided. The Supreme Court first addressed this issue in *Oregon v. Elstad*, 470 U.S. 298 (1985), where a suspect who had not yet been provided with *Miranda* warnings made an inculpatory statement to a police officer before later making a full confession after *Miranda*

warnings had been provided.  *Id.* at 301-02.  The suspect subsequently moved to suppress both his unwarned and warned statements, arguing that "the statement he made in response to questioning at his house let the cat out of the bag and tainted the subsequent confession as fruit of the poisonous tree."  *Id.* at 302 (internal quotations and citations omitted).

In adjudicating this argument, the Supreme Court observed that the "*Miranda* exclusionary rule . . . sweeps more broadly than the Fifth Amendment itself" and "may be triggered even in the absence of a Fifth Amendment violation."  *Id.* at 306. Because of this, the Court concluded that "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  *Id.* at 309.  Instead, the Court held that although "*Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement" turns "solely on whether it is knowingly and voluntarily made."  *Id.*  In other words, "where law enforcement officers have not engaged in coercive or improper tactics in obtaining an initial statement, but merely failed to advise a defendant of his *Miranda* rights, 'determining the admissibility of a subsequent statement is relatively straightforward.  Such a statement is admissible if it was obtained after the defendant: (1) was advised of his or her *Miranda* rights; and, (2) knowingly and voluntarily waived those rights."  *United States v. Verdugo*, 617 F.3d 565, 574 (1st

Cir. 2010) (quoting *United States v. Marenghi*, 109 F.3d 28, 32 (1st Cir. 1997)); *see also United States v. Faust*, 853 F.3d 39, 47-48 (1st Cir. 2017) (enunciating the same standard and citing *Elstad* for support).

Nearly twenty years after deciding *Elstad*, the Supreme Court encountered a similar factual situation—albeit with an important twist— in *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, law enforcement officers awakened a suspect at 3:00 am, took her to a police station, and interrogated her for thirty to forty minutes without *Miranda* warnings, during which time she confessed. *Id.* at 604-05 (plurality opinion). After a twenty-minute break, law enforcement resumed questioning, provided *Miranda* warnings, and confronted the suspect with her unwarned statements. *Id.* at 605. The suspect subsequently moved to suppress both her unwarned and warned statements. *Id.* At the suppression hearing, the officer who conducted the interrogation testified that he had made a "conscious decision" to withhold *Miranda* warnings based on "an interrogation technique he had been taught." *Id.* at 606. The Supreme Court also noted that an officer had "testified that the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted not only by his own department, but by a national police training organization and other departments in which he had worked." *Id.* at 609.

Faced with these facts, a four-Justice plurality of the Supreme Court held that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could

55

function 'effectively' as *Miranda* requires." *Id.* at 611-12.  In reaching this outcome, the plurality observed that "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.* at 613.  The plurality also identified "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their objective," namely, "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

Justice Kennedy, who provided the fifth vote in *Seibert*, concurred without joining the plurality opinion.  In his separate opinion, Justice Kennedy agreed with the plurality that "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621 (Kennedy, J., concurring in the judgment).  He went on to observe that the plurality's test "applies in the case of both intentional and unintentional two-stage interrogations" and therefore "cuts too broadly." *Id.* at 621-22.  Instead, Justice Kennedy concluded, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.* at 622.

56

Although several Circuits have concluded that Justice Kennedy's narrower opinion in *Seibert* is controlling, the First Circuit has "not settled on a definitive reading of *Seibert*." *Faust*, 853 F.3d at 48 n.6.  Instead, in post-*Seibert* cases, the First Circuit has often concluded that applying both *Elstad* and *Seibert* yields the same result.  *See id.* at 48; *Verdugo*, 617 F.3d at 575; *United States v. Jackson*, 608 F.3d 100, 104 (1st Cir. 2010).  Though the First Circuit's interpretation of *Seibert* creates an ambiguity, the Court need not dwell on it here.  Under both the *Elstad* test and the *Seibert* test, all of Mr. Brougham's statements to law enforcement must be suppressed.

Under *Elstad*, a suspect's warned statements are admissible, regardless of any unwarned statements the suspect may have made, if the suspect 1) is advised of their *Miranda* rights and 2) knowingly and voluntarily waives those rights.  *Faust*, 853 F.3d at 47-48.  Here, the first prong of the test is easily satisfied.  During Mr. Brougham's interview, Detective Unterkoefler read the *Miranda* warnings from a sheet of paper.  *Interview Video* at 01:25:40-01:28:30; *Interview Tr.* at 56:7-59:20. Having reviewed the video and transcript of Mr. Brougham's interview, the Court confirms that the *Miranda* advisement was complete and accurate, and the parties make no arguments to the contrary.  As a result, there can be no doubt that Mr. Brougham was eventually informed of his *Miranda* rights.

Turning to the second prong of the *Elstad* test, the parties dispute whether Mr. Brougham ever voluntarily waived his *Miranda* rights.[7]  In Mr. Brougham's view,

---

[7]    Mr. Brougham makes no argument that his *Miranda* waiver was not knowing, apart from a passing remark that "there is insufficient evidence of a knowing and voluntary waiver."  *Def.'s Second*

Detectives Unterkoefler and Estes made "improper promises and inducements" by giving him "a lighter while in custody to induce him to talk" and initiating "discussions about addiction and helping him and not charging him with felony possession." *Def.'s Reply in Support of Def.'s Second Mot. to Suppress* at 3. The Government disagrees, pointing out that "the detective read the *Miranda* warnings out loud to [Mr. Brougham], the defendant said he understood each right (including that he could stop questioning at any time) and he wanted to speak with detectives, and he executed a written waiver of his rights." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 11. Further, the Government asserts that "the defendant's statements reflect that he understood his rights, he knew that he did not have to speak with the detectives, and he was making an informed and deliberate choice to speak with them." *Id.* The Court agrees with Mr. Brougham, concluding that there is insufficient evidence that Mr. Brougham's waiver was voluntary.

As noted above, a *Miranda* waiver "must be made knowingly, intelligently, and voluntarily." *Rang*, 919 F.3d at 117. A "waiver is made voluntarily if the waiver is 'the product of a free and deliberate choice rather than intimidation, coercion and deception.'" *Carpentino*, 948 F.3d at 26 (quoting *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000)). "To determine the voluntariness of a waiver, it is necessary to look at the totality of the circumstances, including 'the tactics used by

---

*Mot. to Suppress* at 1. Mr. Brougham failed to "substantiate or otherwise develop this claim in the hearing or briefing that followed." *United States v. Giambro*, No. 2:22-cr-00044-GZS, 2023 U.S. Dist. LEXIS 73097, at *8 n.18 (D. Me. Apr. 27, 2023). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Id.* (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). The Court has not considered the claim that Mr. Brougham's *Miranda* waiver was not knowing.

the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne.'" *United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000) (internal citation omitted) (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987)).  Even so, a waiver cannot be involuntary without some evidence of coercion or overreaching by law enforcement.  *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The voluntariness of a waiver . . . has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word"); *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006) ("A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness").  When assessing waiver, "[a]n inquiring court must start with a presumption that the suspect did not waive his rights, and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence." *Carpentino*, 948 F.3d at 26.

In reviewing the record leading up to Mr. Brougham's purported waiver, the Court identified several instances of subtle coercion by Detectives Unterkoefler and Estes.  First, the record shows that after Mr. Brougham attempted to smoke crack cocaine in the interview room, Detectives Unterkoefler and Estes not only ignored his requests to be taken to his cell but did not even acknowledge the requests at the time he made them.  *See Interview Tr.* at 37:18-23 ("**Mr. Brougham:** No, I don't want to talk to you then.  Bring me to jail. . . . **Det. Unterkoefler:** Okay.  We're just going to chill"); *id.* at 40:12-20 ("**Mr. Brougham:** I wish it did kill me. . . . I'm ready to go to

the cell. . . . **Det. Unterkoefler:** Okay"). When Detective Estes finally addressed Mr.

Brougham's request, it was during the following exchange:

> **Detective Estes:** Yeah. Obviously we can take you to jail whenever we
> wanted to, right?
> **Mr. Brougham:** Mm-hmm.
> **Detective Estes:** But we want to talk to you.
> **Mr. Brougham:** What for?
> **Detective Estes:** Because we want to get the back story here.

*Id.* at 42:18-25. Such a response is inconsistent with Mr. Brougham's right to cut off

questioning, which is the "critical safeguard" that the *Miranda* rights are designed to

protect. *See Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975). Although the detectives

subsequently advised Mr. Brougham that he could stop answering questions at any

time, *Interview Tr.* at 58:23-59:3, the force of this admonition may have been blunted

by the detectives' coercive actions preceding the advisement—namely, outright

ignoring Mr. Brougham's request twice and then making clear that they, not him,

had the power to decide when he would go to jail. All told, the detectives' apparent

disregard for Mr. Brougham's attempts to terminate the encounter may have led Mr.

Brougham to believe that he had no choice but to talk to the detectives.

Second, in their attempt to downplay the significance of Mr. Brougham's

attempt to smoke crack cocaine in the interview room, Detectives Unterkoefler and

Estes repeatedly told Mr. Brougham that they did not "care" or "give a shit" about his

drug possession. *Id.* at 36:19-21, 37:7-10, 39:13-15; *see also id.* at 39:17 ("**Det. Estes:**

It's minor shit"). But the detectives' overall course of conduct belies these statements.

After all, Mr. Brougham's drug possession shed light on his drug addiction, which

turned out to be the motive for the bank robbery. *See, e.g., id.* at 51:23-24 ("**Mr.**

60

**Brougham:** I robbed a bank because I needed drugs"). Having confirmed the motive, it is a much shorter step to solve the crime. Detective Estes even told Mr. Brougham—before he received *Miranda* warnings—that his drug addiction was "the backstory that we're trying to get." *Id.* at 50:23-24. Because Mr. Brougham's drug possession cannot be viewed separately from his drug addiction, which the detectives sought to explore in great detail, the overall record contradicts the detectives' attempts to downplay the significance of Mr. Brougham's drug possession.

Even if the detectives truly did not care about Mr. Brougham's drug possession, which seems unlikely, their statements nonetheless highlighted the power imbalance at play in the interview room. Further, to the extent the detectives' statements can be understood as suggestions that Mr. Brougham's drug possession would have no consequences, it is not clear from the record that the detectives had the power to provide such assurances. At the very least, a person in Mr. Brougham's position likely would have viewed these statements as a reminder that they could be charged with drug possession.

Third, in offering to help Mr. Brougham with his drug addiction, the detectives made statements suggesting that their assistance was conditioned on Mr. Brougham being forthcoming. Immediately before Detective Unterkoefler administered the *Miranda* warnings to Mr. Brougham, Detective Estes told him, "Listen, we want to talk further about this. And we want to help you; but in order to do that, we have to explain some things to you, okay?" *Id.* at 54:5-8. Detective Estes made this statement after Mr. Brougham had expressed frustration about not being able to overcome his

drug addiction in the past.  *Id.* at 59:9-11 ("**Mr. Brougham:** I can't get away from it, man.  I've tried.  I guess you guys will help me").  Read in context, then, Detective Estes' statement can be interpreted as an attempt to coerce Mr. Brougham into confessing by promising help to Mr. Brougham, who clearly desired it.

Finally, the detectives stressed the importance of talking to Mr. Brougham and learning the truth from him for roughly six of the ten minutes before Mr. Brougham made his unwarned confession.[8]  *Interview Video* at 01:13:18-01:17:00,  01:20:47-01:22:48.  Further, the detectives explicitly told Mr. Brougham that they wanted to learn about a bank robbery, implying they believed Mr. Brougham was involved. *Interview Tr.* at 49:1-4.  The Court acknowledges that "[n]either an admonition to tell the truth (even if repeated) nor a suggestion that cooperation would lead to favorable treatment is enough, without more, to constitute impermissible coercion." *Carpentino*, 948 F.3d at 28 (citing *United States v. Jacques*, 744 F.3d 804, 809-10 (1st Cir. 2014); and *United States v. Bezanson-Perkins*, 390 F.3d 34, 42-43 (1st Cir. 2004)). But here, the detectives spent an extended amount of time imploring Mr. Brougham to tell the truth about the bank robbery, after denying his requests to be taken to a jail cell and instead insisting that they wanted to "get the back story here."  *Interview Tr.* at 42:18-25.  That Mr. Brougham understood the detectives' exhortations as coercing him to confess is clear from his unwarned confession: "I robbed a bank because I needed drugs.  *Is that what you want to hear?*"  *Id.* at 51:23-24 (emphasis supplied).  The detectives' insistence on speaking to Mr. Brougham, combined with

---

[8]     The detectives were largely out of the room for the other four minutes.  *See Interview Video* at 01:17:00-01:20:59.

the other factors discussed above, show that Detectives Unterkoefler and Estes coerced Mr. Brougham into confessing to the robbery.

Even in the face of such overreaching, some individuals likely could have provided a *Miranda* waiver that was "the product of a free and deliberate choice." *Carpentino*, 948 F.3d at 26 (quoting *Rosario-Diaz*, 202 F.3d at 69). The record reveals, however, that Mr. Brougham could not provide such a waiver because of his addiction and overall mental state at the time the *Miranda* warnings were administered. There is ample evidence that Mr. Brougham was addicted to illegal narcotics at the time of his arrest and that this addiction affected his judgment after his arrest. Most obviously, Mr. Brougham attempted to smoke crack cocaine in the interview room, a fact the detectives knew because they had to intervene to stop him. *Interview Video* at 01:09:06-01:09:50. Further, before and after his attempt to smoke, Mr. Brougham tried to bargain with the detectives, promising to answer their questions in exchange for a lighter and the ability to smoke. *See Interview Tr.* at 33:7-9 ("**Mr. Brougham:** Can you give me a lighter and leave me alone for five minutes? And I'll answer any . . . question you want"); *id.* at 36:22-24 ("**Mr. Brougham**: Let me have my . . . pipe back and I'll -- leave me alone and I'll answer any questions"). Therefore, it is clear that Mr. Brougham's addiction affected his conduct in the interview room.

In turn, Mr. Brougham's conduct in the interview room lays bare the severity of his addiction. Indeed, Mr. Brougham was so addicted that he resorted to attempting to smoke crack cocaine, an illegal narcotic, *while in custody at a police station*. This was not a spur of the moment decision; Mr. Brougham asked the

detectives for a lighter five times in nine minutes.  *Id.* at 24:4-19, 33:7-9, 33:11-14, 31:21, 34:8-11; *Interview Video* at 00:58:18-01:07:49,  More than simply wanting a lighter, Mr. Brougham was focused on obtaining one, and his continual willingness to negotiate with detectives for the return of his pipe after they interrupted his attempt to smoke shows that his decision making was driven by his addiction.  In other words, Mr. Brougham's statements and conduct before his attempt to smoke crack cocaine must be discounted because he was thinking only of the drug.

After his thwarted attempt to smoke, Mr. Brougham may have understood that he would not be able to satisfy his addiction.  But his addiction continued to drive his behavior and resulted in him having a demeanor of despair and desperation in the interview room.  Shortly after his attempt to smoke crack cocaine, Mr. Brougham said of his addiction, "I wish it did kill me."  *Id.* at 40:12-15.  Later on, shortly before Mr. Brougham made his unwarned confession, the following exchange occurred:

> **Mr. Brougham:** I need to get rid of the demons I got.  I . . . wish you well.  It ain't going to go away from here.  I know it.
> **Detective Unterkoefler:** Well, I wish I could.
> **Mr. Brougham:** I -- I wish you could too.
> **Detective Unterkoefler:** I really do.
> **Detective Estes:** We want to talk about that.  Okay?
> **Mr. Brougham:** A bullet in my head.  That's about the only thing that I could do.
> **Detective Estes:** Well, I know that -- I know -- I know people that have gotten away from it.
> **Mr. Brougham:** But I tried to do it last night, and --
> **Detective Estes:** You -- you tried to do what? Listen --
> **Mr. Brougham:** I -- I would've shot myself if I did it right.
> **Detective Unterkoefler:** Well, I'm glad you didn't.
> **Detective Estes:** I'm glad you didn't.

*Id.* at 52:12-53:8. Mr. Brougham's comments evince hopelessness and an inability to make the type of "free and deliberate choice" in the face of police coercion that a

voluntary waiver requires. *See Rosario-Diaz*, 202 F.3d at 69. Indeed, it is clear from the record that Mr. Brougham's demeanor made him especially susceptible to the coercive tactics employed by the detectives.

The record also reveals that, far from being ignorant of Mr. Brougham's desperate state, Detectives Unterkoefler and Estes were fully aware of Mr. Brougham's addiction well before administering the *Miranda* warnings. Indeed, both detectives explicitly acknowledged it. *See Interview Tr.* at 38:4-8 ("**Det. Unterkoefler:** . . . I got -- I got addiction running through my family . . . ."); *id.* at 41:22-25 ("**Det. Estes:** And your addiction does explain a lot to me, um, because I've seen it, and I know people do stupid shit because of that, because of the addiction is so --"). Yet despite their apparent understanding of the consequences of addiction, the detectives never stopped to consider whether Mr. Brougham could continue with the interview, despite his desperate act of trying to smoke crack cocaine at the police station, his repeated attempts to negotiate with them afterward, and his comments about attempting self-harm and wishing the addiction would kill him. Instead, they pressed forward.

Simply put, Mr. Brougham's behavior at the police station was driven by his addiction. It was not possible for him to provide a *Miranda* waiver that was the product of a free and rational choice because he was not thinking rationally. Instead, his will was overborne by the coercive tactics of the detectives. Based on the detectives' conduct and Mr. Brougham's characteristics, the Court, after considering the totality of the circumstances, concludes that Mr. Brougham's purported *Miranda*

waiver was involuntary.  As a result, Mr. Brougham did not validly waive his *Miranda* rights, and his post-*Miranda* statements must be suppressed under the *Elstad* test.

In arguing against this conclusion, the Government first points out that Detective Unterkoefler, after telling Mr. Brougham to speak up if he was confused, "read the *Miranda* warnings to the defendant, and in response, the defendant said he understood those rights and expressly agreed to speak with detectives." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 10.  The Government further argues that Mr. Brougham's choice to speak with detectives was "deliberate" because Mr. Brougham "asked the detectives questions" and answered "their questions confidently and without hesitation." *Id.* at 11.  But these contentions ignore the circumstances surrounding Mr. Brougham's purported waiver and are therefore at odds with a totality-of-the-circumstances assessment.  *See Palmer*, 203 F.3d at 60.  While the facts the Government relies upon are certainly probative of Mr. Brougham's waiver being voluntary, many other facts, recounted above, point toward the opposite conclusion.

The Government also argues that the Court should find Mr. Brougham's waiver to be voluntary because Mr. Brougham signed a written waiver, which the First Circuit has found can be "strong evidence of the knowing and voluntary nature of the defendant's relinquishment of his *Miranda* rights." *Carpentino*, 948 F.3d at 26 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  But here, the strength of Mr. Brougham's written waiver is undercut by the circumstances surrounding

Detective Unterkoefler's administration of the *Miranda* warnings.   Further, Mr. Brougham did not sign the written waiver until roughly eight and a half minutes after he had been verbally advised of his *Miranda* rights, during which time he made additional incriminating statements.   *Interview Video* at 01:28:19-01:36:48.   It is also unclear from the Court's perspective whether Mr. Brougham knew what he was signing when he signed the written waiver.   Detective Unterkoefler did not stop the interview to allow Mr. Brougham to read the waiver, and instead handed him the waiver while in the midst of asking a question:

> **Detective Unterkoefler:** Would you be interested in -- forgot to have you sign this, sorry.  Would you be interested in us reaching out to some contacts and have them maybe talk to you and meet with them?

*Interview Tr.* at 70:18-24.   Under these circumstances, then, the fact that Mr. Brougham signed a written waiver does not compel a finding of voluntariness. Instead, the Court concludes that Mr. Brougham did not waive his *Miranda* rights voluntarily and that Mr. Brougham's post-*Miranda* confession must be suppressed under the *Elstad* test.

Turning to the *Seibert* test, in determining whether the two-step interrogation in *Seibert* required the suppression of the suspect's unwarned and warned statements, the plurality considered "(1) 'the completeness and detail of the questions and answers in the first round of interrogation'; (2) 'the overlapping content of the two statements'; (3) 'the timing and setting of the first and second [interrogations]'; (4) 'the continuity of police personnel'; and (5) 'the degree to which the interrogator's questions treated the second round as continuous with the first.'" *Faust*, 853 F.3d at 48 (quoting *Seibert*, 542 U.S. at 615).   Since the *Seibert* factors require that the pre-

*Miranda* and post-*Miranda* interrogations be compared, and the parties disagree about what interaction constituted the pre-*Miranda* interrogation, the Court addresses this threshold issue.

According to Mr. Brougham, the first interrogation for the purposes of the *Seibert* analysis happened when Detectives Unterkoefler and Estes were conversing with him prior to administering the *Miranda* warnings.  *Def.'s Resp. to Gov't's Suppl. Br.* at 3-4.  The Government, on the other hand, "submits that these pre-*Miranda* statements were not in response to police interrogation and therefore do not warrant the same analysis under *Seibert*."[9]  *Gov't's Reply Suppl. Br.* at 5 n.2.  "Rather," the Government continues, "the pertinent issue is whether the Defendant's pre-*Miranda* statements to [Detective Wastella], sometimes in response to questioning, warrants the suppression of his post-*Miranda* confession."  *Id.*; *see also Gov't's Suppl. Br.* at 5-8.  The Court determines that Mr. Brougham's pre-*Miranda* interactions with Detectives Unterkoefler and Estes were part of the pre-*Miranda* interrogation.

The Government's argument appears to be premised on the contention that Mr. Brougham's interactions with Detective Wastella were distinct from his interactions with Detectives Unterkoefler and Estes.  But as the Court has already discussed, Detective Wastella's questions about Mr. Brougham's drug use were directly relevant to the robbery investigation because they provided foundational information about the motive for the robbery.  Further, the record shows that,

---

[9]     The Government cites no caselaw in support of this conclusion, nor does it explain in any way why Mr. Brougham's pre-*Miranda* interactions with Detectives Unterkoefler and Estes did not amount to an interrogation.

whatever his suspicions, Mr. Brougham did not know he had been arrested for bank robbery until Detective Unterkoefler told him.  *See Interview Tr.* at 42:1-2 ("**Mr. Brougham:** So what I am -- what am I here for then?"); *id.* at 42:22-23 ("**Det. Estes:** But we want to talk to you. **Mr. Brougham:** What for?").  Finally, the video from the interview room clearly shows that from the first time Mr. Brougham was left alone with Detective Wastella, he was continually interacting with at least one of the three detectives, apart from the brief period during which he asked to be left alone for the purpose of smoking illegal narcotics.  *Interview Video* at 00:48:04-01:36:48.  There is no evidence in the record that suggests Mr. Brougham understood his interactions with Detective Wastella to be distinct from his interactions with Detectives Unterkoefler and Estes.  Absent such evidence, the Court views Mr. Brougham's time in the interview room as one continuous interaction with multiple detectives, touching on a few related topics.  Therefore, the Court will examine the actions of all three detectives as one interaction for purposes of the *Seibert* analysis.

Further, the Court has no trouble concluding that Mr. Brougham's pre-*Miranda* interaction with the detectives was a custodial interrogation, which requires "the combination of 'custody' and 'interrogation.'"  *United States v. Sanchez*, 817 F.3d 38, 44 (1st. Cir. 2016).  In determining whether a person is in custody, the "relevant inquiry is 'whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  *United States v. Swan*, 842 F.3d 28, 31 (1st Cir. 2016) (alteration in original) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).  Here, the

interrogation took place in an interview room at the police station, and Mr. Brougham was handcuffed for part of it.  The record therefore plainly shows that Mr. Brougham had no power to end the interaction and instead was clearly in custody for its duration.

"Interrogation for *Miranda* purposes includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  *Sanchez*, 817 F.3d at 44 (alteration in original) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  Here, Detective Wastella asked Mr. Brougham a variety of direct questions about his drug use, and he should have known that these questions were "reasonably likely" to elicit incriminating responses.  *See, e.g.*, *Interview Tr.* at 15:17-19 ("What are you doing -- what were you doing at your worst?  You still -- are you still using?").  As such, the Court finds that Mr. Brougham's pre-*Miranda* interaction with the detectives was a custodial interrogation.  Therefore, the Court will treat this interaction as the first interrogation for purposes of the *Seibert* analysis.

Having cleared away the underbrush, the Court turns to the *Seibert* analysis in earnest.  Of the five *Seibert* factors, only one weighs in favor of admitting Mr. Brougham's post-*Miranda* statements.  That factor is "the completeness and detail of the questions and answers in the first round of interrogation."  *Faust*, 853 F.3d at 48 (quoting *Seibert*, 542 U.S. at 615).  Although Mr. Brougham discussed his drug addiction in some detail before being advised of his *Miranda* rights, he did not provide any details about the bank robbery, other than saying that he committed it.  Further,

the detectives posed detailed questions about the robbery post-*Miranda*, but they asked no such questions pre-*Miranda*.  Therefore, the Court concludes that the post-*Miranda* interrogation was much more detailed and complete than the pre-*Miranda* interaction, meaning that the first *Seibert* factor does not weigh in favor of suppression.

Even so, the Court concludes that the final four *Seibert* factors favor the suppression of all of Mr. Brougham's statements.  The Court begins with the second factor—"the overlapping content of the two statements."  *Faust*, 853 F.3d at 48 (quoting *Seibert*, 542 U.S. at 615).   Although Mr. Brougham's post-*Miranda* statements were much more detailed than his pre-*Miranda* statements, there was subject matter overlap.  Critically, one of Mr. Brougham's pre-*Miranda* statements— "I robbed a bank because I needed drugs"—provided the foundation for many of his post-*Miranda* statements.   *Interview Tr.* at 51:23-24.   Further, Mr. Brougham discussed his substance abuse with the detectives both before and after he was advised of his *Miranda* warnings.  Given that Mr. Brougham's pre- and post-*Miranda* statements concerned the same topics—the bank robbery and his substance abuse— the Court concludes that the second *Seibert* factor weighs in favor of suppression.

Turning to the third *Seibert* factor, the Court determines that "the timing and setting of the first and second [interrogations]" likewise weigh in favor of suppression. *Faust*, 853 F.3d at 48 (alteration in original) (quoting *Seibert*, 542 U.S. at 615).  For the duration of his interaction with the three detectives, Mr. Brougham remained in the same interview room at the Augusta Police Department.  Further, there was no

break during the interaction.  Detective Unterkoefler even testified that the interview

with Mr. Brougham was a "continuous flow" and that the detectives did not stop the

interview and then resume it after an extended period at any point.  *Suppression Tr.*

at 68:15-20.  Finding no variation in the timing or setting of the two interrogations,

the Court concludes that the third *Seibert* factor weighs in favor of suppression.

With respect to the fourth factor—"the continuity of police personnel"—the

Court observes that Detectives Unterkoefler and Estes were present both before and

after Mr. Brougham was advised of his *Miranda* rights.  *See Faust*, 853 F.3d at 48

(quoting *Seibert*, 542 U.S. at 615).  Although Detective Wastella did not take part in

Mr.  Brougham's  post-*Miranda*  interrogation,  the  continued  involvement  of

Detectives Unterkoefler and Estes, as well as the absence of any new officers, leads

the Court to conclude that the fourth *Seibert* factor weighs in favor of suppression.

Finally, addressing the fifth factor, the following exchange makes it clear that

Detectives Unterkoefler and Estes treated the second interrogation as continuous

with the first:

> **Detective Unterkoefler:** We'll just move on to something else.  Um,
> but so -- so basically, it's quite the, uh -- the opening from our
> introduction; but yeah, we'll just get right to the point.  I think you just
> said that you know why you're here.  So basically we're investigating a
> robbery that happened on Saturday.  Okay? Um, and, you know, putting
> two and two together with what just happened, I'm assuming, you know,
> based on our conversation -- I'm not assuming, I know, based on our
> conversation, that you've been an addict for a long time, and that's
> probably a good assumption for me to assume that's why you did what
> you did on Saturday.
> **Mr. Brougham:** Yep.

*Interview Tr.* at 59:19-60:11.  During this exchange, which occurred immediately after

Mr. Brougham's *Miranda* advisement, Detective Unterkoefler alluded both to Mr.

Brougham's confession—"I think you just said that you know why you're here"—and to Mr. Brougham's statements about his drug addiction—"I know, based on our conversation, that you've been an addict for a long time." Far from treating the post-*Miranda* interrogation as a separate interaction, Detective Unterkoefler used Mr. Brougham's pre-*Miranda* statements as a starting point to ask further questions. Therefore, the fifth *Seibert* factor weighs in favor of suppression.

Having determined that four of the five *Seibert* factors weigh in favor of suppressing all of Mr. Brougham's statements, the Court concludes that the *Seibert* test requires suppression. Therefore, under both the *Elstad* test and the *Seibert* test, Mr. Brougham's post-*Miranda* statements warrant suppression. As a result, the Court grants Mr. Brougham's motion to suppress these statements.

### C.     Mr. Brougham's Invocation of His Right to Remain Silent

Mr. Brougham advances an alternative argument for suppression: that he invoked his right to remain silent before he confessed. The Court agrees.

During a custodial interrogation, "a suspect may bring the questioning to a halt" by invoking the right to remain silent or the right to counsel. *Simpkins*, 978 F.3d at 9-10; *see also United States v. Thongsophaporn*, 503 F.3d 51, 55-56 (1st Cir. 2007) ("Where a suspect asserts his right to counsel or right to remain silent, further interrogation may not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police'" (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). A suspect who wishes to invoke their right to remain silent must do so unambiguously. *Berghuis*, 560 U.S. at 381-82; *Simpkins*,

978 F.3d at 12.  However, "this standard does not require a suspect to use 'talismanic phrases or any special combination of words.'"  *United States v. Price*, 64 F. Supp. 3d 281, 284 (D.R.I. 2014) (quoting *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996)).

Although Mr. Brougham points to several statements that he claims constitute an invocation of his right to remain silent, *see Def.'s Reply in Support of Def.'s Second Mot. to Suppress* at 2-3, the Court focuses its analysis on the following exchange:

> **Detective Unterkoefler:** Listen, we don't care about the drugs.  Okay?
> I get it.  You have an addiction.  We might be able to help you with
> something like that.
> **Detective Estes:** Come on.  Come on, man.  This isn't going to help any.
> Okay?
> **Mr. Brougham:** I just want to get my pipe, and I'll answer any --
> **Detective Estes:** No.  We're not -- we're not.  We can't.  Listen, man.  I
> know -- I want you to be able to -- let's go in --
> **Mr. Brougham:** No, I don't want to talk to you then.  Bring me to jail.

*Interview Video* at 01:09:55-01:10:15; *Interview Tr.* at 37:7-19.  Although the First Circuit has cautioned that "words are like chameleons; they frequently have different shades of meaning depending upon the circumstances," *Simpkins*, 978 F.3d at 12 (quoting *United States v. Romain*, 393 F.3d 63, 74 (1st Cir. 2004)), Mr. Brougham's statement—"No, I don't want to talk to you then.   Bring me to jail"—cannot reasonably be understood as anything other than an unambiguous invocation of the right to remain silent.  Further, in seeking to be taken to his cell, Mr. Brougham made it clear that he wanted to terminate all questioning.  *Cf. Smith v. Boughton*, 43 F.4th 702, 710 (7th Cir. 2022) (finding ambiguity in a suspect's statement that he did not want to talk "about this" because of the possibility "that *this* referred only to the robbery . . . and that Smith was willing to continue talking about the van" (emphasis

74

in original)).  As such, the Court concludes that Mr. Brougham's statement was an unambiguous invocation of his right to remain silent.

The Government makes a number of arguments to the contrary.  First, it maintains that Mr. Brougham's "statements that he wanted to go to his cell did not clearly communicate to law enforcement that he wanted to invoke his right to remain silent and cease questioning." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 12. But courts have suggested that a request to be taken to jail can indicate a desire to invoke the right to remain silent. *See Anderson v. Terhune*, 516 F.3d 781, 788 (9th Cir. 2008) ("Saying that he wanted to be taken into custody was an indication that Anderson did not want to talk about the murder, his drug use, or anything else"). Further, in the statement discussed above, Mr. Brougham's request to be taken to jail was made in combination with the statement, "I don't want to talk to you then." Read together, these statements remove any ambiguity that might accompany a simple request to be taken to jail, and the Court rejects the Government's argument to the contrary.

Next, the Government notes that "[a]t the time the defendant made these statements, the detectives had not asked the defendant a single question about the robbery." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 13.  While this is true, Detective Wastella had asked Mr. Brougham several questions about his use of illegal drugs. *See, e.g., Interview Tr.* at 15:17-19.  Still, the Government's argument raises an important point: there's no evidence in the record that Detectives Unterkoefler and Estes were aware that Detective Wastella had asked Mr. Brougham any

questions.  This raises the issue of whether the detectives could have reasonably understood Mr. Brougham's statement as an invocation of the right to remain silent, despite its unambiguous nature.

In resolving this question, the Court first notes that a suspect can invoke their right to remain silent before they have been advised of their *Miranda* rights.  *See United States v. Bonner*, 302 F.3d 776, 783 (7th Cir. 2002) ("A defendant's right to silence . . . exists even before the defendant receives *Miranda* warnings").  Further, the right to remain silent exists to safeguard "a person's right to cut off questioning." *United States v. Barone*, 968 F.2d 1378, 1383 (1st Cir. 1992) (quoting *Mosley*, 423 U.S. at 103).  To hold, when multiple officers are involved in an interrogation, that an individual can only invoke this "critical safeguard" with officers who have already asked questions would introduce a technicality that is at odds with the overall thrust of the *Miranda* doctrine and the Fifth Amendment itself.  *See id.*  Further, such a rule would incentivize law enforcement to turn a blind eye to what is happening in the interview room, thereby diminishing a person's ability to invoke the right to remain silent.  Therefore, the Court concludes that Mr. Brougham's unambiguous invocation of his right to remain silent was no less effective because it was made to Detectives Unterkoefler and Estes as opposed to Detective Wastella.

In a related vein, the Government suggests that Mr. Brougham "made these statements in the heat of the moment after his pipe was taken." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 13-14.  In support, the Government points out that "the detectives testified that they interpreted and understood the Defendant's statements

76

to mean that he was agitated with them and 'lashing out' because they took his pipe away and he was not permitted to smoke narcotics in the interview room." *Gov't's Reply Suppl. Br.* at 4. The Court views this argument as suggesting that the context of Mr. Brougham's invocation can overcome the plain meaning of the words he used. Because this suggestion is at odds with the Supreme Court's decision in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Court rejects it.

In *Berghuis*, the Supreme Court held for the first time that an invocation of the right to remain silent must be unambiguous. 560 U.S. at 381-82. In so holding, the Court noted that "[a] requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Id.* at 381 (alterations in original) (quoting *Davis*, 512 U.S. at 458-59). The Court also observed that "[i]f an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Id.* at 382 (quoting *Davis*, 512 U.S. at 461). Accepting the Government's argument here would reintroduce the ambiguity the *Berghuis* Court sought to eliminate. Making a suspect's invocation of the right to remain silent context-dependent, as the Government urges, would force law enforcement to make the type of difficult decisions that worried the *Berghuis* Court. In other words, "[u]sing 'context' to transform an unambiguous invocation into an open-ended inquiry defies both common sense and Supreme Court law." *Price*, 64 F. Supp. 3d at 284-85 (quoting

*Anderson*, 516 F.3d at 787).   The Court accordingly rejects the Government's argument to the contrary.

The Government further claims that "[a]fter the defendant made these statements about not wanting to talk, the detectives 'scrupulously honored' his wishes and they did not question him; instead, they took a break and left the room." *Gov't's Opp'n to Def.'s Second Mot. to Suppress* at 15.   In making this argument, the Government is referring to the rule that an invocation of the right to remain silent does not permanently cut off questioning; rather, "the admissibility of statements obtained after a person in custody has decided to remain silent depends on whether the government has 'scrupulously honored' his right to cut off questioning."   *Barone*, 968 F.2d at 1383 (quoting *Mosley*, 423 U.S. at 104).   In determining whether law enforcement scrupulously honored a suspect's right to cut off questioning, "courts must consider, *inter alia*, the time that elapsed between interrogations, whether fresh warnings were provided, the scope of the second interrogation, and the intensity with which the officers pursued questioning after the suspect asserted the right to silence." *Id.* at 1384.

Here, the record reveals that the detectives were only out of the room for roughly three and a half minutes.   Despite the Government's unsupported claim, leaving the room for such a short amount of time did not scrupulously honor Mr. Brougham's invocation.   As the Supreme Court noted in *Mosley*, "[t]o permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to

undermine the will of the person being questioned." 423 U.S. at 102. Indeed, to conclude that the detectives' actions scrupulously honored Mr. Brougham's invocation would eviscerate the "critical safeguard identified in *Miranda*," namely, "a person's right to *cut off* questioning." *Barone*, 968 F.2d at 1383 (emphasis supplied) (internal quotations omitted).

Finally, the Government argues that "the record demonstrates that the defendant wanted to speak with the detectives, that he understood he could stop answering questions at any time, and that his decision to waive his right to remain silent was a deliberate and intentional one." *Gov't Opp'n to Def.'s Second Mot. to Suppress* at 14-15. In support, the Government relies upon interactions that occurred after Mr. Brougham invoked his right to remain silent. *Id.* But "[a]n accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *United States v. Lara Lara*, 440 F. Supp. 3d 64, 69 (D. Mass. 2020) (emphasis omitted) (quoting *Smith v. Illinois*, 469 U.S. 91, 100 (1984)). Because the detectives should have scrupulously honored Mr. Brougham's invocation of the right to remain silent, the Court declines to consider evidence created after their failure to do so. Instead, the Court concludes that Mr. Brougham's statements to law enforcement must be suppressed.

Having found two distinct bases for granting Mr. Brougham's second motion to suppress, the Court determines that all of Mr. Brougham's statements to law enforcement, both before and after he was advised of his *Miranda* warnings, must be

79

suppressed.[10]  However, the Court is not suppressing Mr. Brougham's statements to Abigail Cameron and Casey Brougham at this time.  The factual background of these conversations is undeveloped because they are not a matter of record, and Mr. Brougham has only cryptically averred—without citing any authority—that they are inadmissible.  *See Zannino*, 895 F.2d at 17.  Moreover, if there is a relationship between Abigail Cameron, who is Mr. Brougham's girlfriend, and Casey Brougham, who is Mr. Brougham's uncle, and law enforcement, it is not a matter of record.  If Mr. Brougham wishes for the Court to suppress his statements to Abigail Cameron and Casey Brougham, he should present the issue in a separately filed motion with a sufficient record and appropriate citations to authority.

## V.   CONCLUSION

The Court DENIES Joshua A. Brougham's Motion to Suppress Re: Warrantless Arrest (ECF No. 41) and GRANTS Joshua A. Brougham's Motion to Suppress Statements (ECF No. 42).

---

[10]   Although the Court has not directly addressed the admissibility of Mr. Brougham's pre-*Miranda* statements, it is well established that law enforcement must provide *Miranda* warnings before interrogating a suspect in a custodial setting, and that "statements obtained in violation of the *Miranda* principles are inadmissible."  *Simpkins*, 978 F.3d at 9; *see also Elstad*, 470 U.S. at 306-07 (observing that the Fifth Amendment "prohibits use by the prosecution in its case in chief only of *compelled* testimony," but that a failure by law enforcement to administer the *Miranda* warnings creates a presumption of compulsion that is "irrebuttable for purposes of the prosecution's case in chief" (emphasis in original)).  Because the Court determined above that Mr. Brougham was subjected to a custodial interrogation from the moment Detective Wastella began asking questions about his drug use, it follows that Mr. Brougham's pre-*Miranda* statements must be suppressed due to the detectives' failure to administer the *Miranda* warnings before commencing a custodial interrogation.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of January, 2024